2017 UT App 212

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHADLEY KEITH CALVERT,
Appellant.

Opinion
No. 20150213-CA
Filed November 16, 2017

Third District Court, West Jordan Department
The Honorable Mark S. Kouris
No. 121400830

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and John J. Nielsen, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
GREGORY K. ORME and KATE A. TOOMEY concurred.

POHLMAN, Judge:

¶1     Chadley Keith Calvert appeals his convictions for aggravated assault, a third degree felony, and for threatening with or using a dangerous weapon in a fight or quarrel, a class A misdemeanor. Calvert contends that his trial counsel provided constitutionally ineffective assistance in failing to raise arguments related to double jeopardy and that the trial court exceeded its discretion in admitting evidence of a prior bad act. He also argues that his trial counsel was ineffective in failing to object to the jury's access to a state-owned laptop for the purpose of viewing an exhibit and that counsel's failure was structural error. We affirm.

BACKGROUND[1]

¶2    After an altercation in front of his house in July 2012, during which Calvert threatened neighbors with a gun, Calvert was charged with third degree aggravated assault and with threatening with or using a dangerous weapon in a fight or quarrel. Before trial, the State filed a motion in limine seeking to admit evidence of two prior incidents during which Calvert allegedly threatened neighbors with the use of deadly force. The State argued that the admission of evidence of Calvert's prior acts was warranted to show the absence of accident or mistake and to rebut Calvert's claims of fabrication and self-defense. The trial court refused to admit the older of the two incidents but, over Calvert's objection, ruled that evidence of the more recent 2008 incident (the Holladay incident) could be admitted for the purpose of rebutting Calvert's claims of fabrication and self-defense.

¶3    At trial, the State offered testimony from several witnesses to the July 2012 altercation. Several minors recounted that on that evening they and their families attended a party a few houses away from Calvert's house. As this group of minors passed by Calvert's property, Calvert stepped out onto his front porch and yelled profanities at them, telling them to stay away from his yard. The oldest minor, A.H., approached Calvert and told him "not to talk to [the children] like that." Calvert then "exchanged words" with A.H., yelling that the minors needed to stay away from his property and threatening to "kick [A.H.'s] ass." A.H. then said that he was going to get his parents and

---

1. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly. We include conflicting evidence as relevant and necessary to understand the issues on appeal." *State v. Dozah*, 2016 UT App 13, ¶ 2, 368 P.3d 863 (citation omitted).

quickly returned to the party. One of the minors testified that Calvert "pulled out a gun or something like that" during this argument.

¶4     Several adults testified that A.H. and other minors told the adults at the party that a man was screaming and swearing at them. A.H.'s uncle (Uncle) immediately went to check on the children and stood on the sidewalk in front of Calvert's house. Calvert was at his front door and had a gun in his hand. The gun had a laser sight that emitted a "red light." When Uncle asked Calvert what happened, Calvert told him to leave and pointed the gun at Uncle's chest for "probably 30 seconds." "[S]everal times," Calvert "put the laser on" Uncle and "took it away." Two other adults from the party arrived at the scene and both saw Calvert holding a gun. After they urged Uncle to go home, Calvert threatened that he would "bring out [his] dogs so [they] could have a conversation dog-to-dog." Calvert also told them to leave his property or "things were going to get bad." A.H. called 911. Shortly before the police arrived, Calvert ran and put his gun in his garage.

¶5     A responding officer (Officer) who interviewed Calvert that night testified that Calvert reported that he had had an altercation with the neighbors and that "some kids were hanging . . . on [his] tree." Calvert pointed out the tree, but Officer "didn't see any broken branches," only "a few leaves on the ground." When Officer asked Calvert about a gun, Calvert responded that he had been "sitting on his steps with just the laser pointer" and that he had pointed the laser at the ground. Calvert said that he had a gun in an upstairs bedroom and agreed to show it to Officer. The gun was a Smith & Wesson Sigma that was loaded and stored in a neoprene holster. The Sigma did not have a laser sight and did not match the witnesses' descriptions of Calvert's gun. Calvert told Officer that, during the altercation, he did not have time to come inside to retrieve the gun but that he called his neighbor.

¶6     Officer testified that, once back outside, he informed Calvert that the neighbors reported that Calvert put the gun in the garage. Calvert denied that report and, despite having said he did not have time to get the Sigma from the upstairs bedroom, stated that "it was the Sigma that he had." When Officer asked Calvert for permission to search the closed garage to verify his statement that he did not place a gun there, Calvert eventually consented to a search and admitted that there was "a Glock in the . . . garage with a laser sight on it." Another officer searched the garage and secured the Glock. Officer did not observe any other laser pointers on the property.

¶7     Calvert's former neighbor (Former Neighbor) also testified about the Holladay incident, which had been the subject of the State's motion in limine. She testified that in 2008, she and Calvert lived in the same duplex in Holladay, Utah. On Halloween, she had had an altercation with Calvert. She was at home when a friend reported seeing someone outside taking pictures and hiding behind Former Neighbor's car. According to Former Neighbor, when she walked outside to investigate, Calvert grabbed and pushed her. She fell, and when she attempted to stand up, he pushed her down again, calling her names and swearing at her. He also threatened to "kill [her] or something," and then sped away in his truck. On cross-examination, Former Neighbor explained that, after the altercation, she and Calvert each brought charges against the other and that all charges were ultimately dropped.

¶8     In his defense, Calvert elicited testimony from his neighbor, B.M., who lived across the street. B.M. testified that Calvert called him on the night of the July 2012 altercation and told him, "[Y]ou might need to come out here, there might be a situation." According to B.M., he went outside and saw Calvert talking to a man on the sidewalk near Calvert's driveway. B.M. heard the man near the driveway say to Calvert, "Why don't you come over here, homes." B.M. observed a "red light" that "looked like a laser," and although he "couldn't tell" if there was

a gun, he could see what looked like a "red dot" from a laser "dancing around . . . on the ground." B.M. called the police.

¶9    Calvert also testified in his defense. He stated that when his dogs barked and woke him up that evening, he observed "a bunch of children just causing all sorts of ruckus in [his] front yard." He claimed that one child was hanging on his tree and causing it to scratch his vehicle. Calvert told the children to "get out of [his] tree," and they "started yelling" at him. Calvert and one minor exchanged profanities.

¶10    According to Calvert, after the group went on its way, he "grabbed a flashlight," checked his property, and discovered a broken sprinkler. He fixed the sprinkler and then brought food out on the porch. As Calvert was eating, he "heard a scuffle behind [him], turned around," and saw someone "trying to reach through [the] railing [to] grab [him]." Calvert "jumped up," opened his front door, and the alarms for his house and garage went off.

¶11    Believing that someone had triggered the garage alarm by entering the garage, Calvert called B.M. for help and retrieved a gun from his upstairs bedroom. When he opened the garage door to investigate, he saw a man standing inside. Calvert pointed the gun, with the laser on, at the man's head and instructed him to get off his property. According to Calvert, the man put his hands up and backed out of the garage. Once the man was halfway down the driveway, Calvert secured his gun in his paddle holster. From the threshold of his garage, Calvert saw another man in the darkness to his left side and a third man standing to his right side under his tree. Calvert could also see B.M. across the street using his phone. B.M. then talked with the strangers, and although B.M. and Calvert told the men to leave Calvert's property, the man in the driveway would not leave. When the police arrived, Calvert removed his gun from the paddle holster and set them both on the four-wheeler in his garage.

¶12    After the defense rested, the State recalled Officer, who then testified that, during their interactions, Calvert did not mention someone grabbing him through the railing on his porch or that someone had been in his garage. Officer also testified that the only holster he saw on Calvert's premises was the holster in Calvert's bedroom that held the Sigma.

¶13    Before submitting the case to the jury, the court instructed that if the jury considered Former Neighbor's testimony, it could do so "for the limited purposes of: considering defendant's fabrication and self-defense claim in the current case." The court further cautioned that the evidence regarding the Holladay incident was "[neither] admitted to prove a character trait of the defendant nor to show that the defendant has a propensity to act in a certain way." The court reminded the jury that Calvert was on trial for only the charged crimes in the present case and warned that the jury could not convict Calvert based on the belief that Calvert might have committed another act at "some other time."

¶14    The court also instructed that to find Calvert guilty of aggravated assault, the jury was required to find beyond a reasonable doubt the following elements: "1. That . . . Calvert committed an act of assault upon [Uncle]; and 2. That such attempt or act was committed intentionally or knowingly; and 3. That [Calvert] used a dangerous weapon." For the jury to find Calvert guilty of threatening with or using a dangerous weapon in a fight or quarrel, the jury had to find beyond a reasonable doubt these elements: "1. That . . . Calvert was in the presence of two or more people; and 2. Drew or exhibited any dangerous weapon, to wit: a handgun; and 3. (a) Did so in an angry or threatening manner, or (b) unlawfully used the same in any fight or quarrel." Additionally, the court provided instructions regarding self-defense and defense of habitation.

¶15    As the trial court and counsel collected the exhibits to send back with the jury for deliberations, the court noted that

State's Exhibit 2 was a CD, which contained the recording of A.H.'s 911 call. The prosecutor volunteered that he had "a laptop . . . if [the jurors] need it." The court responded, "Very good. We'll let them listen to that . . . ." Defense counsel did not object.

¶16    The jury found Calvert guilty of both aggravated assault and threatening with a dangerous weapon. Calvert subsequently filed a motion to arrest judgment, in which he asserted that "the prosecutor's computer laptop was taken back to the jury room during deliberations, and remained in the jury room throughout the jury's deliberations," and that good cause therefore existed to arrest judgment. He asserted that the verdict was "incurabl[y] taint[ed]" because "[t]here is no way to ever know for certain whether the juror[s] used the computer, accessed government files on the computer, learned of other evidence, or communicated with outside parties." In opposition, the State asserted that the laptop "contain[ed] no information related to the case" and that, because it "was a tool to review admitted evidence," it did not taint the verdict. The trial court judge agreed with the State, explaining, "[T]he laptop was controlled, it was only for the playing of the 9-1-1 call and I don't see that it caused any taint at all." Calvert appeals.

ISSUES AND STANDARDS OF REVIEW

¶17    Calvert advances three main contentions on appeal. First, Calvert contends that his trial counsel rendered constitutionally ineffective assistance by failing to raise arguments arising out of double jeopardy concerns. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether [the] defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (alteration in original) (citation and internal quotation marks omitted).

¶18 Second, Calvert contends that the trial court erred in granting the State's motion to admit other bad acts evidence under rule 404(b) of the Utah Rules of Evidence. We will reverse a trial court's decision to admit evidence of other bad acts under rule 404(b) only if the trial court exceeded its discretion and the error was harmful. *State v. High*, 2012 UT App 180, ¶ 14, 282 P.3d 1046.

¶19 Third, Calvert contends that his trial counsel provided constitutionally ineffective assistance in failing to object when the prosecutor proposed sending his laptop into the jury deliberation room, and that such failure constitutes structural error for which prejudice is presumed. As set forth above, we consider Calvert's ineffective assistance of counsel claim as a matter of law. *See Carr*, 2014 UT App 227, ¶ 6.

ANALYSIS

I. Double Jeopardy Arguments

¶20 Calvert contends that his trial counsel provided constitutionally ineffective assistance when he failed to raise arguments related to double jeopardy. In particular, he asserts that his trial counsel performed deficiently by (A) failing to move the trial court to merge the threatening conviction into the aggravated assault conviction, (B) failing to move to dismiss one of the two charges on the ground that it could lead to "multiple verdicts for the same conduct," and (C) failing to request that the threatening with a dangerous weapon charge be submitted to the jury as a lesser included offense of the aggravated assault charge.

¶21 The Sixth Amendment guarantees defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684–86 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) "that counsel's

performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Id.* at 687.

¶22   With regard to the first prong, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "This presumption accounts for the widely varying circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant." *Met v. State*, 2016 UT 51, ¶ 113, 388 P.3d 447 (alteration in original) (citation and internal quotation marks omitted). A defendant must therefore establish "that the challenged actions cannot be considered sound strategy under the circumstances." *Menzies v. State*, 2014 UT 40, ¶ 76, 344 P.3d 581 (citation and internal quotation marks omitted). Furthermore, "because the decision not to pursue a futile motion is almost always a sound trial strategy," counsel's failure to make a motion that would be futile if raised does not constitute deficient performance. *State v. Bond*, 2015 UT 88, ¶ 63, 361 P.3d 104 (citation and internal quotation marks omitted).

A.   Trial Counsel's Failure to Move for Merger

¶23   First, Calvert contends that he received ineffective assistance of counsel when his trial counsel failed to move for merger of his two convictions. According to Calvert, because the elements of aggravated assault and threatening with a dangerous weapon "sufficiently overlap," and because the crimes were not "sufficiently independent," trial counsel should have moved to consolidate the convictions under the merger doctrine. The State responds that Calvert's counsel did not perform deficiently, arguing that any motion to merge would have been futile. In support, the State asserts that merger is precluded because threatening with a dangerous weapon "has an additional element that aggravated assault does not" and because the threatening charge "was based on separate conduct."

¶24   We agree with the State that, had Calvert's counsel sought merger, the motion would not have been successful. *See id.* "The motivating principle behind the merger doctrine is to prevent violations of constitutional double jeopardy protection." *State v. Smith*, 2005 UT 57, ¶ 7, 122 P.3d 615. Utah Code section 76-1-402 codifies the merger doctrine, stating, "A defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense." Utah Code Ann. § 76-1-402(3) (LexisNexis 2012); *see also Smith*, 2005 UT 57, ¶ 8 (stating that "the test for determining whether a conviction for two separate offenses violates the Double Jeopardy Clause 'is essentially the same as that in Utah Code [section] 76-1-402(3)'" (quoting *State v. Wood*, 868 P.2d 70, 90 (Utah 1993))). The statute sets out the circumstances in which an offense will be deemed a lesser included offense for purposes of merger, including when the lesser offense "is established by proof of the same or less than all the facts required to establish the commission of the offense charged." Utah Code Ann. § 76-1-402(3)(a).

¶25   The Utah Supreme Court has identified a "two-part test for determining whether a conviction for a second offense arising out of the same set of facts violates" Utah Code section 76-1-402(3)(a). *Smith*, 2005 UT 57, ¶ 9. The test requires "a comparison of 'the statutory elements of the two crimes [first] as a theoretical matter and [second], where necessary, by reference to the facts proved at trial.'" *Id.* (alterations in original) (quoting *State v. Hill*, 674 P.2d 96, 97 (Utah 1983)). Under the first step, "we compare the statutory elements to determine if the lesser offense is proven by the same or less than all the elements required to prove the greater offense." *State v. Berriel*, 2011 UT App 317, ¶ 8, 262 P.3d 1212, *aff'd on other grounds*, 2013 UT 19, 299 P.3d 1133. If "the greater [offense] cannot be committed without necessarily having committed the lesser, then the lesser offense merges into the greater crime." *State v. Chukes*, 2003 UT

App 155, ¶ 10, 71 P.3d 624 (citation and internal quotation marks omitted).

¶26    "In most cases, comparison of the statutory elements will suffice to determine whether a greater–lesser relationship exists." *Id.* (citation and internal quotation marks omitted). For instance, when a lesser offense always "requires 'proof beyond that needed for proof of the bare elements of [the greater offense],'" the lesser offense is not a *lesser included* offense of the greater offense. *See id.* ¶ 12 (quoting *State v. Brooks*, 908 P.2d 856, 862 (Utah 1995)). "Only if [the first analytic step] does not resolve the [issue] need we proceed to the second analytic step." *Id.* ¶ 10 (alterations in original) (citation and internal quotation marks omitted). "[W]here the two crimes have multiple variations, we proceed to the second step and consider the evidence to determine whether the greater–lesser relationship exists between the specific variations of the crimes actually proved at trial." *Id.* (citation and internal quotation marks omitted).[2]

---

2. Calvert suggests that his counsel was ineffective for not seeking to move for merger of his two convictions under the so-called *Finlayson* merger doctrine, whereby the Utah Supreme Court held that merger may be required for some offenses that are so related even though the offenses do not merge under section 76-1-402. *See State v. Finlayson*, 2000 UT 10, ¶ 19, 994 P.2d 1243 (allowing for kidnapping to merge with another crime where the kidnapping is merely incidental to the other crime). But Calvert makes no attempt to demonstrate the applicability of the doctrine here. Calvert merely concludes that the threatening with a dangerous weapon charge is not sufficiently independent of the aggravated assault to justify a separate conviction. Because Calvert has failed to demonstrate that the *Finlayson* test applies here, or how it should be applied, we do not consider this argument further. *See State v. Thomas*, 961 P.2d 299, 305

(continued…)

¶27 We begin application of the two-step *Hill* test by identifying the elements of the relevant crimes. The crime of third degree aggravated assault is perpetrated when a person intentionally, knowingly, or recklessly commits assault and uses "a dangerous weapon" or "other means or force likely to produce death or serious bodily injury."[3] Utah Code Ann. § 76-5-103(1) (LexisNexis 2012); *see also id.* § 76-2-102 (stating that "when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility"). An assault is

---

(…continued)
(Utah 1998) (explaining that an adequately briefed argument must include development of legal authority and reasoned analysis based on that authority).

Similarly, Calvert cites the framework applicable to requests for lesser included offense instructions set forth in *State v. Baker*, 671 P.2d 152 (Utah 1983). That framework, however, applies to requests for instructions before a case is submitted to the jury. *Id.* at 156–59; *accord State v. Powell*, 2007 UT 9, ¶ 24, 154 P.3d 788; *Duran v. Cook*, 788 P.2d 1038, 1041 n.2 (Utah Ct. App. 1990). And Calvert has provided no authority applying the *Baker* framework here, where the question is whether the charges against the defendant should merge following conviction. Thus, we decline to apply it.

3. We note that the jury instructions in this case did not include the variation of aggravated assault that involves the use of "other means or force likely to produce death or serious bodily injury." *See* Utah Code Ann. § 76-5-103(1) (LexisNexis 2012). The instructions also did not include the reckless mental state but required that Calvert act intentionally or knowingly.

(a) an attempt, with unlawful force or violence, to do bodily injury to another; (b) a threat, accompanied by a show of immediate force or violence, to do bodily injury to another; or (c) an act, committed with unlawful force or violence, that causes bodily injury to another or creates a substantial risk of bodily injury to another.

*Id.* § 76-5-102(1). On the other hand, the crime of threatening with or using a dangerous weapon in a fight or quarrel is committed when, except in self-defense, a person, "in the presence of two or more persons, draws or exhibits a dangerous weapon in an angry and threatening manner or unlawfully uses a dangerous weapon in a fight or quarrel." *Id.* § 76-10-506(2).[4]

¶28     A comparison of the elements of the threatening with a dangerous weapon and aggravated assault statutes reveals that the former has "a unique element that precludes it from being a lesser included offense" of aggravated assault. *See Chukes*, 2003 UT App 155, ¶ 12. Specifically, threatening with a dangerous weapon always requires proof that the conduct occurred in "the presence of two or more persons." Utah Code Ann. § 76-10-506(2). Because aggravated assault does not have the same requirement, the offense of threatening with a dangerous weapon "requires proof beyond that needed for proof of the bare elements of [aggravated assault]." *See Chukes*, 2003 UT App 155, ¶ 12 (citation and internal quotation marks omitted). In other words, a person may commit aggravated assault without necessarily also committing the offense of threatening with a dangerous weapon. *See id.* ¶ 10. As a result, threatening with a dangerous weapon is not a lesser included offense of aggravated assault for purposes of merger under Utah Code section 76-1-

---

4. The relevant statutory provisions have been amended since the time of the offenses. We cite the version of the Utah Code in effect in 2012.

402(3)(a). *See Chukes*, 2003 UT App 155, ¶ 12 (rejecting the argument that identity fraud is a lesser included offense of theft by deception because identity fraud "requires proof that the defendant obtained personal identifying information without authorization," while theft by deception "does not require such proof"); *see also State v. Jackson*, 2011 UT App 318, ¶ 14, 263 P.3d 540 ("Unlawful Sexual Conduct requires the State to prove that the minor is sixteen or seventeen years old and that the defendant is at least ten years older than the minor. Therefore, the establishment of all of the elements of rape will not also prove Unlawful Sexual Conduct, and it is not a lesser included offense of rape.").

¶29   In support of his position, however, Calvert relies on *State v. Oldroyd*, 685 P.2d 551 (Utah 1984). Specifically, Calvert quotes the Utah Supreme Court's statements that the statutes defining aggravated assault and threatening with a dangerous weapon "have elements in common" because "[b]oth require a form of threat and both require the use of a weapon." *See id.* at 554. We conclude that *Oldroyd* is not controlling here.

¶30   In *Oldroyd*, the issue was whether the trial court erred in refusing the defendant's request "to instruct the jury regarding the offense of threatening with a dangerous weapon." *Id.* at 552. To evaluate that issue, the supreme court applied the framework from *State v. Baker*, 671 P.2d 152 (Utah 1983), by considering, first, whether there was "some overlapping of the statutory elements of the offenses," and, second, whether the evidence in that particular case provided "a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *Oldroyd*, 685 P.2d at 553–54 (citation, emphasis, and internal quotation marks omitted); *see also supra* note 2. Under this framework, the court concluded that the trial court should have given a jury instruction on the lesser included offense of threatening with a dangerous weapon. *Oldroyd*, 685 P.2d at 554–56; *see also State v. Campos*, 2013 UT App 213, ¶ 78, 309 P.3d 1160 (reviewing the denial of a request for a

lesser included offense instruction and stating that *Oldroyd* held that "threatening with a dangerous weapon qualifies as a lesser included offense of aggravated assault" (citing *Oldroyd*, 685 P.2d at 554)). Significantly, however, *Oldroyd* did not address whether convictions for aggravated assault and threatening with a dangerous weapon would merge.

¶31   We conclude that Calvert has not demonstrated that for purposes of merger, threatening with a dangerous weapon is a lesser included offense of aggravated assault. As a result, he has not shown that a motion to merge his convictions would have been successful and that therefore his trial counsel rendered ineffective assistance when he failed to pursue such a motion. *See State v. Bond*, 2015 UT 88, ¶ 63, 361 P.3d 104 (explaining that counsel's failure to raise a futile motion does not amount to ineffective assistance). Calvert's claim of ineffective assistance on this ground accordingly fails. *See id.* ¶ 61.

B.     Trial Counsel's Failure to Move to Dismiss

¶32   Second, Calvert briefly contends that his trial counsel rendered constitutionally deficient assistance when he failed to seek dismissal of one of the charges on the basis of multiplicity. The State responds that the problem of multiplicity arises only "from charging multiple counts of the same offense," whereas this case involves "two charges under two different code sections." The State also argues that trial counsel "could have reasonably decided to forgo a multiplicity challenge" because the evidence supported multiple counts of both threatening with a dangerous weapon and aggravated assault, even though "the State only charged one of each."

¶33   We agree with the State that, had Calvert's counsel moved to dismiss on multiplicity grounds, the motion would not have been successful. *See id.* ¶ 63. The rule against multiplicity "prohibits multiple punishments for the same offense." *State v. Rasabout*, 2015 UT 72, ¶ 26, 356 P.3d 1258 (citation and internal

quotation marks omitted). This court has recognized that the "problem of multiplicity arises when 'a single offense [is charged] in several counts.'" *State v. Rasabout*, 2013 UT App 71, ¶ 10, 299 P.3d 625 (alteration in original) (quoting 1A Charles Alan Wright et al., *Federal Practice & Procedure: Criminal* § 142, at 10 (4th ed. 2008)), *aff'd*, 2015 UT 72, 356 P.3d 1258; *see also Multiplicity*, Black's Law Dictionary 1174 (10th ed. 2014) (defining multiplicity as the "improper charging of the same offense in more than one count of a single indictment or information"). This may occur in two situations: (1) "where the indictment charges multiple violations of the same statute but the[] counts are predicated on the same criminal conduct," or (2) "when [a] defendant is charged in the indictment with violating two separate crimes, one of which is a lesser included offense of the other." 1A Charles Alan Wright et al., *Federal Practice & Procedure: Criminal* § 142, at 10 (4th ed. 2008).

¶34    Neither situation is present here. First, Calvert was not charged with "multiple violations of the same statute." *See id.* Instead, he was charged with one count of aggravated assault and with one count of threatening with or using a dangerous weapon in a fight or quarrel. These two separate crimes are not based upon the same statute.[5] Second, threatening with a dangerous weapon is not a lesser included offense of aggravated assault. *See supra* ¶ 28. Thus, multiplicity was not implicated in this case. Because a motion to dismiss on the basis of multiplicity would have been denied, we conclude that Calvert's trial counsel did not perform deficiently by failing to pursue that line

---

5. Aggravated assault is an offense against the person, Utah Code Ann. § 76-5-103(1) (LexisNexis 2012), whereas threatening with a dangerous weapon is a weapons offense, *id.* § 76-10-506(2).

of argument and that Calvert cannot show ineffective assistance of counsel.[6] *See Bond*, 2015 UT 88, ¶¶ 61, 63.

C.      Trial Counsel's Failure to Seek a Lesser Included Offense Instruction

¶35    Third, Calvert contends that he received ineffective assistance when his trial counsel failed to request that the threatening with a dangerous weapon charge be submitted to the jury as a lesser included offense of the aggravated assault charge. But at oral argument before this court, Calvert conceded that trial counsel's decision not to request such an instruction was "a matter of strategy." Thus, having conceded that the challenged action might be considered sound trial strategy, Calvert's claim of ineffective assistance necessarily fails. *See Menzies v. State*, 2014 UT 40, ¶ 76, 344 P.3d 581.

---

6. Calvert also asserts, in cursory fashion, that because the altercation "occurred within a brief period of time and all within the same space," his trial counsel should have sought dismissal of a charge on the ground that the offenses were part of a "single criminal episode." "'An appellant that fails to devote adequate attention to an issue is almost certainly going to fail to meet its burden of persuasion. A party must cite legal authority on which its argument is based and then provide reasoned analysis of how that authority should apply in the particular case . . . .'" *State v. MacNeill*, 2017 UT App 48, ¶ 83, 397 P.3d 626 (quoting *Bank of Am. v. Adamson*, 2017 UT 2, ¶ 13, 391 P.3d 196). Calvert's single criminal episode argument quotes statutory language, but he does not offer any reasoned and developed analysis of that authority and does not demonstrate how that authority applies here. Because his overall analysis of this issue "is so lacking as to shift the burden of research and argument to the reviewing court," *see id.* (citation and internal quotation marks omitted), Calvert has not carried his burden of persuasion on this issue.

## II. Rule 404(b) Evidence

¶36 Next, Calvert contends that the trial court erred in granting the State's motion to admit other bad acts evidence under rule 404(b) of the Utah Rules of Evidence. In particular, he asserts that the evidence of the Holladay incident was not admissible for any proper purpose and that instead its "sole purpose [was] to demonstrate [his] bad character." We need not resolve this question, however, because we agree with the State that any error in admitting the evidence was harmless under the facts of this case.

¶37 Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). Notwithstanding this general prohibition, such "evidence may be admissible for another purpose." *Id.* R. 404(b)(2). Examples of permissible purposes include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

¶38 But "even if the admission of rule 404(b) evidence by the trial court was in error, reversal on appeal is not appropriate unless [Calvert] demonstrates that the error materially affected the fairness or outcome of the trial." *See State v. Otterson*, 2010 UT App 388, ¶ 11, 246 P.3d 168. Indeed, we "will not overturn a jury verdict for the admission of improper evidence if the admission of the evidence did not reasonably affect the likelihood of a different verdict." *State v. Ferguson*, 2011 UT App 77, ¶ 19, 250 P.3d 89 (citation and internal quotation marks omitted). "Harmless errors are those that are sufficiently inconsequential so no reasonable likelihood exists that the error affected the outcome of the proceedings." *Id.* (citation and internal quotation marks omitted).

¶39    The evidence regarding the Holladay incident was introduced entirely through Former Neighbor who testified that she was attacked by Calvert about four years before the July 2012 altercation. Former Neighbor explained that she confronted Calvert, who lived in the other apartment of her duplex, after seeing him taking pictures while hiding behind her car. Calvert pushed Former Neighbor to the ground while swearing at her and threatening to "kill [her]." On cross-examination, Former Neighbor testified that she and Calvert both brought, and later dropped, charges against each other after the Holladay incident. She also testified that Calvert had threatened her "quite a few times" but she did not call the police.

¶40    Assuming, without deciding, that the evidence of the Holladay incident was improperly admitted, Calvert has not demonstrated that its admission was harmful under the circumstances of this case. Despite the fact that the Holladay incident had the potential for the jurors to draw impermissible inferences about Calvert's character, it is not reasonably likely that the exclusion of the evidence would have led to a different result. We reach this conclusion because the evidence of Calvert's guilt was compelling. *See id.* ¶¶ 19–20 (considering the strength of the State's evidence in concluding that the improper admission of rule 404(b) evidence did not prejudice the defendant).

¶41    Several witnesses testified that Calvert began arguing with the minors when they were passing by his property. They recounted how Calvert yelled and swore at the minors to leave and not to touch his property. Five witnesses, including minors and adults, testified that when Uncle—the victim of the aggravated assault—went to confront Calvert, Calvert pointed a gun with a laser attachment at him. Many of the State's witnesses testified that Calvert had a gun in his hand during his arguments with the neighbors. One witness reported seeing Calvert put the gun away in the garage before the police arrived, and Officer testified that a gun with a laser sight was found in

the garage that matched the witnesses' descriptions. In addition, the jury heard the recording of a 911 call and had before it written witness statements that were largely consistent with the witnesses' testimonies at trial. Although there were some discrepancies in the testimony from the numerous eyewitnesses, the essential components of the story were consistent.

¶42     In contrast, Calvert testified to a version of events that was uncorroborated. He did not deny that he had a gun and pointed it at someone that evening, but he argued that he acted in self-defense and in defense of habitation. Calvert admitted to arguing with the minors and testified that they vandalized his property by breaking a sprinkler and scratching his car with a tree branch. According to Calvert, the group then left, he fixed the sprinkler, and he sat outside on his porch to have dinner when he was startled by a stranger "trying to reach through [the] railing [to] grab [him]." After the alarms to his house and garage went off, Calvert grabbed a gun from his bedroom, went to investigate, and found a man standing in his garage. Calvert pointed the gun at the man's head, telling him to get off the property. The man put his hands up and backed down the driveway. When the police arrived, Calvert set his gun and paddle holster down in his garage.

¶43     But Calvert's story was not supported by any other evidence. For example, B.M., the neighbor across the street who testified for the defense, saw a "red dot" "dancing around" on the ground even before he came out of his house, and saw that Calvert was arguing with a man on the sidewalk near Calvert's driveway. B.M.'s testimony thus did not lend support to Calvert's account of events. Moreover, Officer testified that during the night of the altercation, Calvert did not mention someone grabbing him through the railing on his porch or someone being in his garage.

¶44     And even before Calvert testified, the State had cast doubt on Calvert's credibility through Officer's testimony. For instance,

according to Officer, Calvert initially said that he had a laser pointer, not a gun, when he was sitting on the porch. Calvert then showed Officer his Smith & Wesson Sigma and explained that he had not removed it from the bedroom. But when Officer informed Calvert that the neighbors saw him put a gun in the garage, Calvert admitted that "it was the Sigma that he had." Thus, Officer's testimony showed that Calvert's statements had shifted. In addition, according to Officer, the Smith & Wesson Sigma did not have a laser sight and thus did not match the witnesses' descriptions of Calvert's gun. The Glock later found in the garage, however, had a laser sight on it. In light of the fact that the numerous eyewitnesses' testimonies were largely consistent and the fact that Calvert's testimony was uncorroborated and his credibility was in question, the State's case against Calvert was strong even without reference to the Holladay incident. *See State v. Ferguson*, 2011 UT App 77, ¶¶ 19–20, 250 P.3d 89.

¶45 In addition to the strength of the evidence of Calvert's guilt, the prosecutor did not mention the Holladay incident in opening or closing statements or any other time, and the likelihood of the jury drawing impermissible inferences from Former Neighbor's testimony was mitigated by a limiting instruction. Specifically, the court instructed the jury that it could not convict Calvert simply because it believed "that he may have committed some other act at some other time," and explained that the evidence regarding the Holladay incident was "not admitted to prove a character trait of the defendant nor to show that the defendant has a propensity to act in a certain way." This instruction tempered any harmful effect the admission of Former Neighbor's testimony may have had. *See State v. Marchet*, 2012 UT App 197, ¶ 14, 284 P.3d 668.

¶46 Under the facts of this case, we conclude that any assumed error in the admission of the Holladay incident did not prejudice Calvert. Given the strength of the State's evidence and given the weaknesses in Calvert's account, Calvert has not

shown that had the testimony of the Holladay incident been excluded, it is reasonably likely that the jury would have found him not guilty. Accordingly, we reject Calvert's claims in this regard.

## III. The Laptop

¶47 Calvert argues that his trial counsel provided constitutionally ineffective assistance in failing to object when the prosecutor proposed sending the State's laptop into the jury deliberation room. Calvert contends that his counsel's failure to object constitutes structural error "for which prejudice must be presumed." In the alternative, Calvert requests that we remand this case to the trial court under rule 23B of the Utah Rules of Appellate Procedure to create a record sufficient to support this claim of ineffective assistance.

### A.    Structural Error

¶48 Calvert argues that his trial counsel provided constitutionally ineffective assistance in failing to object when the prosecutor proposed sending the State's laptop into the jury deliberation room and in failing to request an evidentiary hearing during which the jurors could be questioned as to the use of the laptop.

¶49    As we have previously stated, to demonstrate ineffective assistance of counsel, Calvert must show (1) that his counsel's performance was deficient, and (2) that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the second prong of this test, "the defendant bears the burden of proving that counsel's errors actually had an adverse effect on the defense." *State v. Munguia*, 2011 UT 5, ¶ 30, 253 P.3d 1082 (citation and internal quotation marks omitted). The proof that trial counsel's acts or omissions prejudiced him "must be a demonstrable reality and not a

speculative matter." *State v. Nelson*, 2015 UT 62, ¶ 10, 355 P.3d 1031 (citation and internal quotation marks omitted).

¶50 Calvert filed a post-trial motion to arrest judgment, arguing that the verdict was "incurabl[y] taint[ed]" because "[t]here is no way to ever know for certain whether the juror[s] used the computer, accessed government files on the computer, learned of other evidence, or communicated with outside parties." The trial court denied the motion, relying on the State's representation that the laptop contained no case-related information and was only a tool to review admitted evidence. The court reasoned that because the laptop was "controlled" and "was only for the playing of the 9-1-1 call," the verdict was not tainted.

¶51 On appeal, Calvert asserts that this court should presume prejudice because "allow[ing] the [S]tate's laptop computer to be utilized by the jury during deliberations" deprived him of "the right to an impartial jury" and "the right to counsel," and therefore constituted a structural defect.[7]

¶52 "Structural errors are flaws in the framework within which the trial proceeds, rather than simply an error in the trial process itself." *State v. Cruz*, 2005 UT 45, ¶ 17, 122 P.3d 543 (citation and internal quotation marks omitted). Because such errors "affect the very framework of the trial," "a structural error analysis presumes prejudice." *Id.* The United States Supreme Court has "found structural errors only in a very limited class of cases," *Johnson v. United States*, 520 U.S. 461, 468 (1997), including when "'assistance of counsel has been denied *entirely* or during *a*

---

7. Calvert does not directly appeal the trial court's denial of the motion to arrest judgment, arguing instead that the court's failure to grant the motion "simply reinforced the structural error" that occurred when his trial counsel failed to object to the prosecutor's offer to allow the jury to use the laptop.

*critical stage* of the proceeding,'" *State v. Maestas*, 2012 UT 46, ¶ 57, 299 P.3d 892 (quoting *Mickens v. Taylor*, 535 U.S. 162, 166 (2002)). The denial of the right to a jury trial is also structural error. *See Sullivan v. Louisiana*, 508 U.S. 275, 281–82 (1993).

¶53 Calvert was denied neither counsel nor a jury trial. He received both. And Calvert does not develop a supported and reasoned analysis that would establish that he was deprived of the rights to counsel and a jury trial merely because the jury had access to a laptop supplied by the prosecution or because his counsel did not object. As this court "will not assume a party's burden of argument and research," *Broderick v. Apartment Mgmt. Consultants, LLC*, 2012 UT 17, ¶ 9, 279 P.3d 391 (citation and internal quotation marks omitted), Calvert thus has not demonstrated that the jury's access to the prosecutor's laptop in this case deprived him of the right to counsel or the right to an impartial jury. Accordingly, Calvert's assertion of structural error and presumed prejudice fails.[8]

---

8. We further note that even if Calvert had shown that the jury's access to the laptop could be labeled a "structural error," the application of the label would not have automatically relieved him of his burden to demonstrate prejudice. The United States Supreme Court recently held that where an unpreserved claim of structural error is challenged through the framework of ineffective assistance of counsel, prejudice is not presumed. *See Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908, 1910–11 (2017). Instead, the defendant must demonstrate "either a reasonable probability of a different outcome in his or her case" or "show that the particular . . . violation was so serious as to render his or her trial fundamentally unfair." *Id.* at 1911; *see also State v. Garcia*, 2017 UT 53, ¶ 36.

B.      Rule 23B Motion

¶54     In the alternative, Calvert requests that we remand this case to the trial court under rule 23B of the Utah Rules of Appellate Procedure to allow him to create a record sufficient to support this claim of ineffective assistance of counsel. Specifically, Calvert asserts that we should remand the case "for the trial court to determine whether extraneous prejudicial information was improperly brought to the jury's attention or an outside influence was improperly brought to bear on any juror as a consequence of the ineffective assistance of counsel." If granted a hearing, Calvert states that "[e]ach of the jurors can thereby be called as witnesses . . . and a final determination made as to whether prejudicial information came forward as a result of the jury's use of the State's laptop computer."

¶55     Rule 23B allows a party to an appeal in a criminal case to "move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). The rule requires the motion to "include or be accompanied by affidavits alleging facts . . . that show the claimed deficient performance of the attorney." *Id.* R. 23B(b). "The affidavits shall also allege facts that show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." *Id.*

¶56     "A remand under rule 23B will only be granted 'upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective.'" *State v. Lee*, 2014 UT App 4, ¶ 5, 318 P.3d 1164 (quoting Utah R. App. P. 23B(a)). Thus, rule 23B "requires a party to perform the factual investigation before asking this court for a remand." *Mackin v. State*, 2016 UT 47, ¶ 41, 387 P.3d 986. "The mere hope that an individual may be able to provide information if subpoenaed to testify is not sufficient. An

affiant must submit specific facts and details that relate to the specific relevant occurrence." *State v. Griffin*, 2015 UT 18, ¶ 19.

¶57  In support of his motion, Calvert supplies unsworn statements from three individuals who were present in the courtroom gallery during trial. The only fact not fully appearing in the record provided in these statements is that after the verdict was read, the prosecutor asked the bailiff to return his laptop and that the bailiff appeared to retrieve it from the jury deliberation room. Calvert also attaches an email from the prosecutor, in which the prosecutor stated that the "office laptop" left with the jury "[did] not have any of [his] files or email on it." The prosecutor also indicated that he did not know "whether the jury used [the laptop] to listen to the cd or [if] the bailiff had just taken it in back in case they needed it."

¶58  Calvert has not adequately supported his rule 23B motion. Specifically, he has not alleged facts that show his claimed prejudice resulting from his trial counsel's failure to prevent the jury from having access to the laptop furnished by the prosecutor. The statements from the courtroom spectators and the prosecutor do not demonstrate that the laptop had any "extraneous prejudicial information" on it or that the jury used it or was exposed to an improper outside influence. Calvert could have obtained affidavits from jurors to support his motion. *See* Utah R. Evid. 606(b)(2) (providing that a juror may testify about whether "extraneous prejudicial information was improperly brought to the jury's attention" or "an outside influence was improperly brought to bear on any juror"). While Calvert asserts that he will call the jurors to testify upon remand, he has not provided affidavits to establish the "specific facts and details" related to the jury's alleged use of the laptop and exposure to improper influences. *See Griffin*, 2015 UT 18, ¶ 19. Instead, Calvert only speculates that the jury's access to the state-owned laptop exposed it to extraneous prejudicial information. *See id.* ("[S]peculative allegations are those that have little basis in articulable facts but instead rest on generalized assertions.").

Because Calvert has failed to provide nonspeculative allegations that could support a determination that he would have obtained a more favorable outcome at trial but for counsel's performance, we deny his rule 23B motion for remand. *See Lee*, 2014 UT App 4, ¶ 12.

CONCLUSION

¶59 Calvert has not shown that his trial counsel rendered constitutionally ineffective assistance in failing to raise arguments regarding merger, multiplicity, and lesser included offenses. In addition, we conclude that any assumed error in the admission of rule 404(b) evidence regarding Calvert's confrontation with Former Neighbor does not undermine our confidence in the verdict. As to Calvert's claim that his counsel was ineffective when he failed to object to the prosecutor furnishing the State's laptop to the jury to view an admitted exhibit, Calvert has not shown that structural error occurred for which prejudice must be presumed, and we deny his related rule 23B motion. Accordingly, we affirm Calvert's convictions.

————