2018 UT App 23

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CASEY FARNWORTH,
Appellant.

Opinion
No. 20160036-CA
Filed February 1, 2018

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 131909921

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes, Jennifer Paisner Williams, and John J.
Nielsen, Attorneys for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and DAVID N. MORTENSEN concurred.

HAGEN, Judge:

¶1     A motorcyclist and his eleven-year-old daughter were
riding along Wasatch Boulevard in Salt Lake City when they
became embroiled in a road rage incident with another driver,
Casey Farnworth. The altercation ended when the motorcyclist
and his daughter were thrown from the motorcycle, and
Farnworth sped off toward the interstate. Fearing that
Farnworth would get away, and despite his attempts to
outmaneuver them, two couples independently followed
Farnworth and called 911 with his license plate number.

¶2     Farnworth was subsequently charged with aggravated
assault, child abuse, failure to remain at an accident involving
injury, and reckless driving. At trial, over Farnworth's objection,

the court admitted the audio recording of a 911 call made by a nontestifying witness, who had pursued Farnworth after the accident. Additionally, the court instructed the jury on the State's alternative theories of reckless driving to which Farnworth's counsel did not object.

¶3    The jury convicted Farnworth of aggravated assault, reckless driving, and failure to remain at an accident involving injury but acquitted him of child abuse. We affirm Farnworth's convictions.

## BACKGROUND[1]

*The Accident*

¶4    A motorcyclist and his eleven-year old daughter were traveling along Wasatch Boulevard when an SUV—driven by Farnworth—merged into the motorcyclist's lane, forcing the motorcycle into the left-hand turn lane. As both vehicles came to a red light, the motorcyclist pulled up to the driver's side of Farnworth's vehicle and gestured with his arm as if to say "what the heck, what's going on?" and to show Farnworth that they were there. In response, Farnworth stuck his hand out the window, flipped off the motorcyclist, and screamed, "I'm going to f'ing kill you."

¶5    When the light turned green both vehicles sped off, and Farnworth began swerving into the motorcycle apparently attempting to push it into oncoming traffic. The motorcyclist

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Bravo*, 2015 UT App 17, ¶ 2 n.1, 343 P.3d 306 (citation and internal quotation marks omitted).

tried to avoid colliding with Farnworth's SUV, but after the third swerve, "either the motorcyclist's tire made contact with the back bumper or he just went down." The motorcyclist and his daughter were both thrown from the motorcycle, and Farnworth continued on, running a red light to accelerate onto the interstate.

¶6    Farnworth was subsequently charged with aggravated assault resulting in serious bodily injury, a second degree felony, *see* Utah Code Ann. § 76-5-103(2)(b) (LexisNexis 2012);[2] child abuse, a second degree felony, *see id.* § 76-5-109(2)(a) (Supp. 2017); failure to remain at an accident involving injury, a class A misdemeanor, *see id.* § 41-6a-401.3 (2014); and reckless driving, a class B misdemeanor, *see id.* § 41-6a-528.

*The Trial*

¶7    The State called several witnesses to testify, including three disinterested eyewitnesses (First Witness, Second Witness, and Third Witness) and a police officer.

¶8    On the day of the accident, First Witness was driving northbound in the right lane of Wasatch Boulevard when she noticed a motorcycle with two riders driving alongside her in the left lane. First Witness testified that, as traffic slowed, she saw an SUV weaving in and out of the two lanes, eventually "pushing [the] motorcyclist out towards the median." When the SUV merged back into the right lane, First Witness saw the motorcyclist "raise[] his hand a little bit" as if to gesture "what the heck." Farnworth responded by "flipping [the motorcyclist] off," yelling out the window, and swerving "towards where the motorcyclist was three times." First Witness testified that it

---

2. The relevant statutory provision has been amended since the time of the offenses. We therefore refer to the version of the Utah Code in effect in 2013.

looked like the motorcyclist was driving in the median to avoid contact. But after Farnworth swerved toward the motorcyclist a third time, the motorcycle crashed. Because First Witness was in the right lane, she was unable to see whether the motorcycle's front tire made contact with Farnworth's rear bumper or if the motorcycle just went down. After First Witness pulled over to aid the motorcyclist and his daughter, she noticed that Farnworth had driven off.

¶9 Second Witness and Third Witness, a married couple, were driving along Wasatch Boulevard together when Second Witness looked in his rear view mirror and noticed Farnworth driving erratically—"going up towards the car in front, switching lanes . . . working his way up to the front." According to Second Witness, while Farnworth was changing lanes, he nearly hit the motorcycle, forcing it into the left turn lane. Then, when both vehicles reached a stoplight, the motorcyclist drove up to the driver's side of the SUV and appeared to confront Farnworth. Although Second Witness could not hear what the motorcyclist and Farnworth were saying, he testified that "it looked like they were going back and forth." When the light turned green, both vehicles sped off, and Farnworth veered at the motorcycle three times, "pushing them further and further into oncoming traffic." The motorcyclist tried to get out of the way, but eventually he was forced to lay the motorcycle down. Second Witness was also driving in the right lane, so he was unable to see whether the SUV hit the motorcycle.

¶10 Third Witness did not see the initial altercation between Farnworth and the motorcyclist, but her husband, Second Witness, drew her attention to the vehicles after they sped off through the green light. Third Witness testified that at that point, "the SUV was trying to swerve and either sideswipe the motorcycle or just push it into oncoming traffic." According to Third Witness, the motorcyclist tried braking to get out of the way, but there were also cars behind the motorcycle. After the SUV swerved "four or five" times, the motorcyclist was forced to

"lay down" the bike, and he and his daughter were thrown into the center turn lane. Third Witness was also uncertain whether the vehicles made contact.

¶11 When the motorcycle went down, Second Witness and Third Witness noticed that the SUV had run a red light and continued driving away from the scene of the accident. Because they did not want Farnworth to get away, they pursued him onto the interstate so they could write down the SUV's license plate number and report it to police. Both witnesses testified that Farnworth was speeding, but Second Witness specified that Farnworth was driving on the interstate in "excess of 90 to 100 miles an hour." The couple also followed Farnworth off of the interstate and into a neighborhood where Farnworth drove between 45 and 60 miles per hour and ran two stop signs.

¶12 Over Farnworth's objection, the State also introduced a 911 call made by an occupant in another vehicle that had followed Farnworth to obtain his license plate number. On the recording, the caller explained to dispatch that she had witnessed Farnworth flip off the motorcyclist and his daughter, impact with them, force them off the road, and continue driving. She also indicated that she had observed damage to the SUV's left rear bumper where the SUV had impacted with the motorcycle.

¶13 Dispatch notified a police officer of the accident and provided him with the SUV's license plate number, which the officer determined was registered to Farnworth. That night, the officer went to Farnworth's residence and noticed an SUV backed into the carport. The officer verified the license plate number, inspected the SUV, and saw that it had several dents and scratches on the driver's side rear bumper. The officer testified that the paint appeared to be freshly damaged because it was still flaking. He also observed what appeared to be a tire mark underneath the same side of the SUV, which according to

the officer, was low enough to be consistent with a motorcycle collision.

¶14 The officer then spoke with Farnworth, who admitted both that he was driving the SUV during the altercation and that he had seen the motorcycle crash. But when questioned further, Farnworth told the officer that "he did not feel the motorcycle crash into his vehicle at any point and [he] did not believe the motorcycle had hit his vehicle."

¶15 Farnworth called two witnesses to testify: his wife and another motorist (Defense Witness) who had been driving in the left lane directly behind Farnworth and the motorcyclist.

¶16 On direct examination, Farnworth's wife, who was a passenger in the SUV, admitted that she "did not see too much of anything" because she had "made it a point to try not [to] make eye contact or be engaging." Nevertheless, she testified that, as they came to a stoplight, she saw through her peripheral vision that the motorcyclist drove into the left turn lane and twice flipped off her husband. She further testified that Farnworth yelled, "Get the hell away from me. What the hell are you doing?" and gave the motorcyclist "the bird." When the light turned green, the motorcyclist continued straight, driving close enough to Farnworth's SUV that his wife was nervous the motorcyclist would damage the SUV's side mirror. According to his wife, Farnworth tried speeding up and then slowing down to let the motorcycle pass, but the motorcyclist "mimicked [his] every move." On at least one occasion, she noticed that their SUV began to drift out of their lane, and she testified that she brought it to Farnworth's attention so he could immediately correct himself. In what Farnworth's wife characterized as a final attempt to evade the situation, Farnworth drove through a light as it was changing. His wife testified that, at that point, Farnworth looked in his rearview mirror and saw the motorcyclist and his daughter standing in the middle of the road, but Farnworth told his wife that he was unsure whether

the motorcyclist had intentionally laid his bike down. Farnworth's wife personally did not believe they were responsible for the accident, because she did not see, feel, or hear any impact. And she testified that the damage on the SUV's rear bumper was a preexisting dent that had been poorly repaired with auto body tape and Bondo.

¶17     Defense Witness testified that on the day of the accident, she had been stopped at a red light in the left lane of Wasatch Boulevard when she saw a motorcycle drive past her in the left turn lane and stop alongside the SUV where it then appeared "[t]here was some kind of road rage." Although Defense Witness could not hear what Farnworth and the motorcyclist were saying, she testified that their gestures indicated that they were involved in an altercation. According to Defense Witness, when the light turned green, both vehicles sped off, and she noticed that the motorcyclist went straight even though he was in the turning lane. At that point, both vehicles began "swerving towards each other, in and out" before they eventually collided. Defense Witness acknowledged that she had provided a written statement to the police immediately after the accident, stating that "the driver [of the SUV] kept swerving toward the motorcycle" and "[o]n the third swerve the driver hit the motorcycle." Defense Witness testified that her written statement was accurate and that "those statements are still true."

¶18     At the close of the evidence, the court instructed the jury that Farnworth could be convicted of reckless driving if the State proved either that he acted in a willful or wanton disregard for the safety of persons or property or that he committed three or more traffic violations within three miles. Farnworth's attorney did not object to submitting these alternative theories to the jury.

¶19     The jury deliberated for eleven hours during which time the jurors submitted multiple questions to the trial court, indicating on at least one occasion that they may be unable to reach a unanimous verdict. During deliberation, the jury also

requested the audio recording of the 911 call, which remained in the jury room for approximately forty-five minutes. Ultimately, Farnworth was convicted of aggravated assault, failure to remain at an accident involving injury, and reckless driving. The jury acquitted Farnworth of the one count of child abuse.

¶20     Farnworth filed a post-trial motion to arrest judgment, *see* Utah R. Crim. P. 23, arguing the trial court should have sustained his objection to the admission of the 911 call. The trial court denied Farnworth's motion and explained that, "even if the evidence should not have been admitted, [the] harm has not been show[n] to merit . . . arresting judgment in this case." Farnworth appeals.

ISSUES

¶21     Farnworth raises two issues on appeal. First, he contends that the 911 call was testimonial hearsay and that its admission at trial violated both the Confrontation Clause of the United States Constitution and the Utah Rules of Evidence on hearsay.

¶22     Second, Farnworth contends that he received ineffective assistance of counsel because trial counsel should have (1) objected to submitting the reckless driving count to the jury on the State's alternative theory that Farnworth committed three traffic violations within three miles and (2) moved the court to merge the reckless driving conviction with the aggravated assault conviction.

ANALYSIS

I. Any Error in the Admission of the 911 Call Was Harmless Beyond a Reasonable Doubt

¶23     Farnworth contends the trial court erroneously admitted the 911 call. Specifically, Farnworth argues the 911 call was

inadmissible because (1) its admission violated his Sixth Amendment right to confront witnesses against him and (2) the recording constituted hearsay not within a recognized exception under the Utah Rules of Evidence. Because we conclude that any error in admitting the 911 call was harmless beyond a reasonable doubt, we do not reach either the constitutional or the evidentiary question.

¶24 Ordinarily, rule 103 of the Utah Rules of Evidence determines the consequences of erroneous evidentiary rulings. *See* Utah R. Evid. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ."). However, "where the error in question amounts to a violation of a defendant's right of confrontation guaranteed by the sixth amendment to the United States Constitution, its harmfulness is to be judged by a higher standard, i.e., reversal is required unless the error is harmless beyond a reasonable doubt." *State v. Hackford*, 737 P.2d 200, 204 (Utah 1987). Under this standard, "the burden shifts to the State to demonstrate that the error was harmless beyond a reasonable doubt."[3] *State v. Sanchez*, 2016 UT App 189, ¶ 33, 380 P.3d 375, *cert. granted*, 390 P.3d 719 (Utah 2017) *and* 390 P.3d 727 (Utah 2017). If the State meets this heightened standard of harmlessness, it logically follows that it also meets the lower standard applied to non-constitutional errors.

¶25 Here, even if admission of the 911 call violated Farnworth's confrontation rights, reversal is not required, because any error was harmless beyond a reasonable doubt. To

---

3. The burden shifts to the State to demonstrate that the error is harmless beyond a reasonable doubt only when, as here, the defendant has preserved the federal constitutional claim at trial. *See State v. Bond*, 2015 UT 88, ¶ 35, 361 P.3d 104 (holding that "the defendant retains the burden to show harm for unpreserved federal constitutional claims under plain error").

determine whether the alleged error was harmless beyond a reasonable doubt, we consider several factors, including:

> the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence [corroborating] or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*State v. Villareal*, 889 P.2d 419, 425–26 (Utah 1995).

¶26 To evaluate the significance of the 911 call in the context of the overall case, it is helpful to identify the discrete factual assertions made in the recording. Besides providing a description of Farnworth's SUV, the nontestifying 911 caller stated that:

- Farnworth flipped off the motorcyclist;

- The SUV got in front of the motorcycle, braked, and then hit the motorcycle;

- The SUV forced the motorcycle off of the road and into oncoming traffic;

- The SUV sustained damage to the left rear bumper where it collided with the motorcycle; and

- The SUV kept going.

Because each of these factual statements were either unnecessary to prove the elements of the crimes charged or were supported by other evidence at trial, we conclude that admission of the 911 call was harmless beyond a reasonable doubt. Below, we outline additional evidence that supports Farnworth's convictions for

aggravated assault and failure to remain at an accident involving injury.

A.    Aggravated Assault

¶27    First, Farnworth argues that admission of the 911 call was not harmless beyond a reasonable doubt because, other than the victims' testimony, it was the only evidence proving that Farnworth's SUV made contact with the motorcycle.

¶28    To convict Farnworth of second degree aggravated assault, the State had to prove that he "intentionally, knowingly or recklessly" used a dangerous weapon to commit an assault that resulted in serious bodily injury. *See* Utah Code Ann. § 76-5-103(2)(b) (LexisNexis 2012) (aggravated assault); *see also id.* § 76-5-102 (assault). Farnworth does not dispute that his SUV qualifies as a "dangerous weapon" under Utah Code section 76-1-601 or that the motorcyclist and his daughter sustained "serious bodily injury." Instead, he disputes whether he intentionally, knowingly, or recklessly committed an assault.

¶29    Farnworth argues that none of the State's disinterested witnesses could see whether the SUV and motorcycle made contact from their relative positions. In response, the State contends that it was unnecessary to prove that the SUV actually hit the motorcycle to convict Farnworth of aggravated assault. We agree with the State.

¶30    At the time of the accident, Utah Code section 76-5-102 provided three definitions of assault [4]—notably, none of the

---

4. The Utah Code defined assault as:
    (a) an attempt, with unlawful force or violence, to
         do bodily injury to another;

(continued…)

definitions required the defendant to make physical contact with the victim. The jury could therefore convict Farnworth of second degree aggravated assault without finding that his SUV hit the motorcycle. Consequently, the 911 caller's statement that the SUV impacted with the motorcycle was unnecessary to the jury's determination of Farnworth's guilt on this count, and we conclude that its admission was harmless beyond a reasonable doubt.

¶31 Moreover, all of the information provided by the 911 caller was cumulative. First, the 911 caller identified Farnworth as the aggressor, explaining that he cut off the motorcycle, flipped off the motorcyclist, and eventually forced the motorcycle off of the road into oncoming traffic. The State presented corroborating testimony from the motorcyclist, his daughter, and three disinterested witnesses—all of whom identified Farnworth as the aggressor. These witnesses testified that Farnworth swerved toward the motorcycle between three and five times. And while Farnworth contends that "[t]he motorcyclist and his daughter had an incentive to minimize their fault in the incident," the State's three disinterested witnesses consistently testified that the motorcyclist appeared to be defensively maneuvering to get out the way but was impeded by cars behind him. Additionally, First Witness testified that, prior to swerving, she saw Farnworth yelling out his window and

_____

(…continued)

> (b) a threat, accompanied by a show of immediate force or violence, to do bodily injury to another; or
>
> (c) an act, committed with unlawful force or violence, that causes bodily injury to another or creates substantial risk of bodily injury to another.

Utah Code Ann. § 76-5-102(1)(a)–(c) (LexisNexis 2012).

flipping off the motorcyclist. Even the statement that the SUV hit the motorcycle—a fact that the jury was not required to find—was cumulative given the testimony of Defense Witness and both victims that the SUV hit the motorcycle on its third swerve and the investigating officer's observation of damage to the SUV's bumper.

¶32     Farnworth's wife was the only witness to testify that the motorcyclist was the aggressor. But even she admitted that Farnworth had made obscene gestures and yelled at the motorcyclist, "drifted" into the motorcyclist's lane at least once, and sped through a changing light even though he saw the motorcyclist and his daughter standing in the middle of road with the motorcycle at their feet. Defense Witness was even less helpful, testifying only that both vehicles had been swerving.

¶33     The evidence overwhelmingly established that Farnworth was the aggressor and that he assaulted the motorcyclist and his daughter by swerving toward them with his SUV and forcing them off the road. Even if we assume the 911 call was the best evidence that physical contact occurred, the State was not required to prove that the vehicles collided to carry its burden of proof on aggravated assault. Moreover, regarding this and other relevant facts, the 911 call was merely cumulative. We thus conclude that admission of the 911 call was not reversible error with regard to the aggravated assault conviction.

B.     Failure to Remain at an Accident Involving Injury

¶34     Second, Farnworth contends that admission of the 911 call was not harmless beyond a reasonable doubt, because it was critical to prove he had "reason to believe that [he] may have been involved in an accident resulting in injury to a person." Utah Code Ann. § 41-6a-401.3(2)(a) (LexisNexis 2014). At trial, it was undisputed that Farnworth was driving the SUV during the incident, that he did not remain at the scene when he saw the motorcycle go down, and that the motorcyclists were injured.

The sole issue for the jury on this count pertained to Farnworth's knowledge of and involvement in the accident. *See id.*

¶35    Farnworth argues that without the 911 call, there was a reasonable probability that he would have been acquitted on this count because the jury seemed to struggle with the conflicting evidence. In support of his argument, Farnworth points out that the jury deliberated for eleven hours; requested a copy of the 911 call recording; and asked the court for a definition of "involved," as it related to this count. In addition, because the prosecutor told the jury in closing argument that the 911 call was "the most direct, freshest evidence you can listen to," Farnworth claims that it was the State's "most damning piece of evidence."

¶36    Where a prosecutor has touted the importance of erroneously admitted evidence, we should be hesitant to find its admission harmless, let alone harmless beyond a reasonable doubt. *See State v. Ellis*, 2018 UT 02, ¶ 55 (Himonas, J., concurring). But despite the prosecutor's inflated assessment of the value of the 911 call, the caller's statements were entirely cumulative. While Farnworth argues that none of the State's disinterested witnesses could see whether the motorcycle and the SUV made contact, Defense Witness and both victims testified to this fact, which was corroborated by the officer's observation of damage to the SUV's bumper. More importantly, whether an impact occurred was immaterial. Nothing in the statute suggests that a driver's responsibility to remain at the scene of an accident is limited to accidents in which a collision occurs. *See generally* Utah Code Ann. § 41-6a-401.3.

¶37    Regardless of whether the vehicles actually made contact, the overwhelming evidence established that Farnworth had reason to believe he may have been involved in an accident. "'Reason to believe' means information from which a reasonable person would believe that the person may have been involved in an accident." *Id.* § 41-6a-401.3(1)(a). Farnworth and his wife admitted that Farnworth had been involved in an altercation

with the motorcyclist, had entered the motorcycle's lane, and was aware that the motorcycle had crashed. His wife testified that Farnworth had looked into his rearview mirror and noticed that the motorcyclist and his daughter were standing in the middle of the road with the motorcycle at their feet. Under these circumstances, Farnworth had reason to believe that he may have caused or contributed to the accident and thus should have remained at the scene.

¶38    Because these critical facts were undisputed, we conclude that any error in admitting the 911 call was harmless beyond a reasonable doubt in connection with the conviction for failure to remain at an accident involving injury.

## II. Ineffective Assistance of Counsel

¶39    Farnworth contends that defense counsel rendered constitutionally ineffective assistance by failing to (1) object to the instruction on the State's allegedly unsupported theory of reckless driving and (2) move for merger of the reckless driving and aggravated assault convictions. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Crespo*, 2017 UT App 219, ¶ 22 (citation and internal quotation marks omitted), *petition for cert. filed*, Nov. 27, 2017 (No. 20170920).

¶40    The Sixth Amendment guarantees a defendant the right to effective assistance of counsel. *See* U.S. Const. amend. VI; *see also McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). "To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) 'that counsel's performance was deficient,' and (2) 'that the deficient performance prejudiced the defense.'" *State v. Calvert*, 2017 UT App 212, ¶ 21, 407 P.3d 1098 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Failure to prove either

element defeats an ineffective assistance of counsel claim. *See Strickland*, 446 U.S. at 697.

¶41 Under *Strickland*'s deficiency prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," as measured against "prevailing professional norms." *Id.* at 688. In reviewing counsel's performance, "we recognize the variety of circumstances faced by defense counsel and the range of legitimate decisions regarding how best to represent a criminal defendant." *Zaragoza v. State*, 2017 UT App 215, ¶ 28, 407 P.3d 1122 (citation and internal quotation marks omitted). The defendant must therefore "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *State v. Bond*, 2015 UT 88, ¶ 62, 361 P.3d 104 (citation and internal quotation marks omitted). To prove prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

A.    Failure to Object to Reckless Driving Instruction

¶42 First, Farnworth contends that his trial counsel performed deficiently when she failed to object to instructing the jury on the State's alternative theories of reckless driving. Under Utah law, a person may be convicted of reckless driving if he or she operates a vehicle either "in a willful or wanton disregard for the safety of persons or property" or "while committing three or more moving traffic violations . . . in a series of acts occurring within a single continuous period of driving covering three miles or less in total distance." Utah Code Ann. § 41-6a-528(1)(a)–(b) (LexisNexis 2014). Farnworth argues that the State's theory that he committed three traffic code violations within three miles was unsupported at trial because the State never presented evidence on the distance that Farnworth traveled or provided instruction on Utah's Traffic Code.

¶43 "A party is entitled to have the jury instructed on its theory of the case if competent evidence is presented at trial to support its theory . . . ." *State v. Marchet*, 2012 UT App 197, ¶ 17, 284 P.3d 668 (citation and internal quotation marks omitted). Here, we conclude that the State presented sufficient, competent evidence to support giving a reckless driving instruction on the theory that Farnworth committed three traffic violations within three miles. Because the State was entitled to the instruction, it would have been futile to object. Therefore, trial counsel's performance was not deficient. *See State v. Alzaga*, 2015 UT App 133, ¶ 73, 352 P.3d 107 ("[F]ailure of counsel to make . . . objections which would be futile if raised does not constitute ineffective assistance." (citation and internal quotation marks omitted)).

¶44 Although the State did not present direct evidence of the relevant speed limits or the distance driven when the alleged traffic violations occurred, the jury could have reasonably inferred that Farnworth committed three traffic violations within three miles. *See Salt Lake City v. Howe*, 2016 UT App 219, ¶ 11, 387 P.3d 562 ("[T]he jury may draw reasonable inferences from direct or circumstantial evidence." (citation and internal quotation marks omitted)). "A reasonable inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *State v. Cristobal*, 2010 UT App 228, ¶ 16, 238 P.3d 1096 (citation and internal quotation marks omitted).

¶45 Second Witness and Third Witness testified that they followed Farnworth onto the interstate at the 6200 South entrance ramp. According to Second Witness, Farnworth was driving on the interstate at "very high speeds" in "excess of 90 to 100 miles an hour" until he reached the combined exit for 3900 South and 3300 South. Farnworth turned left on 3900 South and then pulled into a neighborhood when it appeared that Farnworth noticed he was being followed. Both witnesses testified that Farnworth then began speeding through the

neighborhood in an apparent attempt to lose them. Second Witness estimated that Farnworth was driving "in excess of 45, 50 miles an hour," and Third Witness testified that he was driving "up to 60 miles per hour." Second Witness also testified that Farnworth ran two stop signs in the neighborhood—"a stop sign at a point to turn left to go back towards 3900 South" and "the 3900 South stop sign."

¶46    Farnworth argues that there was insufficient evidence on which the jury could conclude that the alleged traffic violation on the interstate occurred within three miles of the alleged traffic violations within the neighborhood. But to convict Farnworth of reckless driving under this theory, it was unnecessary for the jury to rely on the alleged speeding on the interstate. Instead, the jury could have relied solely on the traffic violations that Farnworth committed in the neighborhood. Specifically, the jury could have found that Farnworth (1) drove between 45 and 60 miles per hour through the neighborhood, (2) ran a stop sign "to turn left to go back towards 3900 South," and (3) "ran the 3900 South stop sign" to exit the neighborhood. Based on the testimony of the Second Witness and Third Witness that Farnworth both entered and exited the neighborhood from 3900 South, it would have been reasonable for the jury to infer that these three traffic violations took place within a span of three miles or less. Because there was sufficient evidence to support a jury verdict on this basis, any objection would have been futile.

¶47    Farnworth also argues that his trial counsel should have objected to submitting this theory to the jury because the State "did not introduce the posted speed limit into evidence and never provided evidence or instruction on the content of the traffic code." As an initial matter, there was sufficient evidence in the record that Farnworth was traveling over the posted speed limit in the neighborhood. Third Witness testified that Farnworth was driving "up to 60 miles per hour," which "was well over the speed limit." As for the lack of instructions on the traffic code, had defense counsel objected on this basis, the trial

court would have presumably instructed the jury that speeding and running a stop sign are, in fact, "moving traffic violations under Title 41, Chapter 6a, Traffic Code." *See* Utah Code Ann. § 41-6a-528(1)(b) (LexisNexis 2014). There is no "reasonable probability . . . that the result of the proceeding would have been different" because the theory still would have been submitted to the jury. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

¶48 We thus conclude defense counsel was not ineffective by failing to object to instruction on the State's alternative theory of reckless driving.

B. Merger

¶49 Second, Farnworth contends that trial counsel provided ineffective assistance by failing to move for merger of Farnworth's reckless driving and aggravated assault convictions. Specifically, Farnworth asserts that the jury could have only convicted him of reckless driving under the theory that he willfully or wantonly disregarded the safety of others and that the only facts that could have supported this theory were the same facts supporting his conviction for aggravated assault. Farnworth argues that the same alleged act of swerving at the motorcycle was the basis for both his reckless driving and aggravated assault conviction. Because reckless driving was established by proof of the same or less than all the facts required to prove aggravated assault, Farnworth contends, the convictions should have merged. We disagree.

¶50 Under Utah Code section 76-1-402, a "defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense." *State v. Calvert*, 2017 UT App 212, ¶ 24, 407 P.3d 1098 (citation and internal quotation marks omitted). An offense qualifies as a lesser included offense when "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged." Utah Code Ann.

§ 76-1-402(3)(a) (LexisNexis 2012). However, "if the convictions rely on 'materially different acts,' then one crime will not be a lesser included offense of another." *State v. Garrido*, 2013 UT App 245, ¶ 31, 314 P.3d 1014.

¶51 We have already rejected Farnworth's argument that there was insufficient evidence to submit the reckless driving count to the jury on the alternative theory that Farnworth committed three traffic violations within three miles. Farnworth does not appear to dispute that, if the jury convicted on that theory, the convictions for reckless driving and aggravated assault would be based on distinct conduct. Even assuming that the jury convicted under the willful and wanton disregard theory, however, Farnworth cannot establish that "the exact same conduct" supported his convictions for aggravated assault and reckless driving.

¶52 The State presented evidence that Farnworth intentionally swerved at the motorcycle twice, forcing the motorcyclist and his daughter into oncoming traffic. This conduct tended to prove that Farnworth operated his vehicle "in willful or wanton disregard for the safety of persons or property." *See* Utah Code Ann. § 41-6a-528(1)(a) (LexisNexis 2014). However, the State also presented evidence that Farnworth swerved a third time and either hit the motorcycle or forced the motorcyclist to lay the bike down. It was this final swerve that ultimately caused the motorcyclist and his daughter to sustain "serious bodily injury." *See id.* § 76-5-103(2)(b) (2012). Consequently, under the facts of this case, because the two crimes are such that the greater can "be committed without necessarily having committed the lesser" they do not stand in the relationship of greater and lesser offenses. *See State v. Hill*, 674 P.2d 96, 97 (Utah 1983) (citation and internal quotation marks omitted).

¶53 We conclude that Farnworth's trial counsel did not perform deficiently by failing to move for merger because, under either theory, the offense of reckless driving was not based on

the same facts as aggravated assault. Accordingly, such a motion would have been futile. *See State v. Alzaga*, 2015 UT App 133, ¶ 73, 352 P.3d 107 ("[F]ailure of counsel to make motions . . . which would be futile if raised does not constitute ineffective assistance." (citation and internal quotation marks omitted)).

## CONCLUSION

¶54    We conclude that any error in admitting the 911 call was harmless beyond a reasonable doubt because the caller's statements were cumulative as to the unchallenged body of evidence necessary to prove the elements of aggravated assault and failure to remain at an accident involving injury. We also conclude that Farnworth did not receive ineffective assistance of counsel, because an objection to the State's alternative theory of reckless driving would not have been sustained and because Farnworth was not entitled to merger of his reckless driving and aggravated assault convictions.

¶55    Affirmed.

_____