2021 UT App 66

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BOBBY FIEDEL ARCHULETA,
Appellant.

Opinion
No. 20190871-CA
Filed June 24, 2021

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 171909463

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and Nathan H. Jack, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGE JILL M. POHLMAN concurred. JUDGE GREGORY K. ORME
concurred, with opinion.

MORTENSEN, Judge:

¶1     Bobby Fiedel Archuleta, triggered to road rage by an alleged horn honk, chased down the other car, and, after arguing with the motorist, pulled out a gun and shot at the motorist before turning and speeding away. A jury later convicted Archuleta on two counts of aggravated assault, one count of possession or use of a dangerous weapon by a restricted person, one count of discharge of a firearm, and one count of theft by receiving stolen property. Archuleta appeals, citing issues with the evidence and jury instructions. We affirm.

BACKGROUND[1]

¶2    Around 4:00 p.m. one late-summer afternoon, while cruising down a Salt Lake City highway, a motorist (A.D.) watched and listened for several blocks as a black sports car followed him, the driver honking and yelling at him. The driver had apparently been enraged after perceiving that A.D. had honked at him. Soon, through his rear-view and side-view mirrors, A.D. saw the driver catch up and pull alongside him.

¶3    The driver confronted A.D., yelling, "Do you want to get popped?" A.D. noticed a "black male passenger" (Passenger) in the passenger's seat of the driver's car, but Passenger did not say anything. Ultimately, A.D. ignored the driver and, as the light changed, kept driving. As A.D. continued to watch, the driver pulled behind him and kept following.

¶4    Further down the road, the driver again pulled near A.D., who had stopped at another light. And, once more, the driver threatened to shoot A.D. Thinking that the driver did not actually have a gun, A.D. yelled back, "Well, if you're going to pop, then pop." And, "Shoot the gun. Shoot the gun. Shoot it. Shoot it. Don't be just threatening me with a gun. Shoot it." As the light changed and A.D. began to pull forward, the driver sped up, raised a black gun, and shot in A.D.'s direction while turning right. The bullet tore through the passenger's door, nearly hitting A.D.'s four-year-old son, and lodged in the passenger's seat, where the seat frame stopped the bullet from hitting A.D. The bullet left three holes: one entrance hole in the

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (cleaned up).

car door's exterior, one exit hole in the car door's interior, and one entrance hole into the seat—"all consistent with one round."

¶5     A.D. called 911 to report the shooting and pursued the fleeing driver until the 911 dispatcher persuaded him to stop. During that phone call, A.D. described the driver as "a Hispanic man with tattoos—including a star tattoo on his face—wearing a turquoise shirt, a black baseball hat with turquoise on it, and prescription glasses." He further reported that the driver drove a "black Charger or Challenger" and that a "black male passenger" was riding in the passenger's seat.

¶6     Police, seeking the driver's identity, soon identified Archuleta as a suspect and began surveilling his apartment within a few hours of the shooting. After only a few minutes, Archuleta arrived—driving a black Dodge Challenger with a black male in the passenger's seat. Archuleta had a star tattoo under his left eye and wore a turquoise shirt, a black baseball hat with turquoise on it, and prescription glasses.

¶7     On searching Archuleta's car, police found a stolen gun one round short of full capacity. Although officers found no casing in Archuleta's car, the Salt Lake Police Crime Lab's director examined the slug found in A.D.'s car to determine if it was fired by the gun recovered from Archuleta's car. The director testified that he was "100 percent sure" that the "bullet recovered from [A.D.'s car] match[ed] the gun that was recovered from Bobby Archuleta's car."

¶8     Archuleta denied being in a road rage incident and claimed he was in Roy, not Salt Lake City, during the incident— a claim identified at trial as an irreconcilable geographical discrepancy. But an investigator familiar with cell phone mapping technology testified that between 3:52 p.m. and 4:35 p.m. on the day of the shooting, Archuleta's cell phone data suggested he was somewhere between 3300 South in Salt Lake City and Bountiful—a set of possible coordinates that did not

preclude him from being present at the shooting's time and place. The investigator testified that "[b]ased on [the cell phone data] before and after [the shooting] and considering travel time, it's literally physically impossible for the phone to" "have been in Roy at that time."

¶9 Archuleta contests none of these facts. Instead, he emphasizes the following. When police first apprehended Archuleta, an officer also interviewed Passenger. Passenger initially claimed he was not near the area when the shooting happened. However, when police found the gun, Passenger changed his story, describing a car pulling up to Archuleta's car and that driver threatening to shoot them. Passenger claimed that when the driver of the other car raised his hand, Passenger ducked down before hearing a loud gunshot. Throughout this interview, he "repeatedly told police they already knew what happened and had the evidence." At trial, the State submitted the police report describing Passenger's statement to imply Archuleta's guilt based on the fact that Archuleta later called Passenger a "rat" when speaking with his wife (Wife). And for the limited purpose of providing context for Archuleta's later statements to Wife, the trial court allowed Passenger's statement.

¶10 Further, at trial, the court admitted, over Archuleta's objection, various jail phone calls between Archuleta and Wife.[2] These calls began with an automated recording stating, "This call can be recorded and subject to monitoring at any time." As played and recited for the jury, the calls' content included:

---

2. When the State played the calls for the jury, the court reporter recorded most of these calls' content as "inaudible." But, during closing argument, the State reviewed the calls again and clarified much of the content. We use both sources to construct this narrative.

- Archuleta's statement: "I can't blame no one else for my situation but myself."

- The exchange between Archuleta and Wife: Wife said, "You did this for no reason." Archuleta responded, "I know."

- Wife's statement: "Well, if you want to hang out with losers and act fucking crazy."

- Archuleta's statement: "I don't see how they're going to make these fucking aggravated assaults and shit stick though because nobody was hit or nothing like that."

- The exchange between Archuleta and Wife: Wife said, "So did [Passenger] tell on you?" Archuleta responded, "Yeah."

- Archuleta's statement: "[Passenger]'s a rat. [Passenger] told on me."

- Archuleta's instruction: "[T]ell him [Passenger]'s a rat."

- The exchange between Archuleta and Wife: Wife said, "He said in fairness that it was found in your car." Archuleta responded, "Yeah." Wife continued, "You have a gun, which is (inaudible)." Archuleta then said, "It's not my gun. Listen, (inaudible)." Wife then asked, "How are you going to fight that?" And Archuleta answered, "Because listen, there's no DNA. There's no prints on the gun."

- Archuleta's statement: "Well, if the victim changes his mind and doesn't testify, they've got no case."

- The exchange between Archuleta and Wife: Wife said, "I know, but you did this." Archuleta responded, "Oh, I know I did."

- Archuleta's statement: "There's no DNA, there's no prints on the gun. Yeah, it was in my vehicle, but there was fucking two of us in that vehicle. And not only that, there was like a fucking good 30 minutes that they were (inaudible) vehicle, occupying my vehicle with me not in my vehicle."

- The exchange between Archuleta and Wife: Wife said, "You did this." Archuleta responded, "You know I'm a fuck up."

¶11   In admitting these statements, the trial court clarified:

> And so jurors, be advised that on these calls, there will be conversations between [Wife] and . . . Archuleta. [Wife]'s statements are not offered for the truth of the matter asserted. They're only offered to provide context to Mr. Archuleta's statements.

¶12   The jury convicted Archuleta on two counts of aggravated assault, one count of possession or use of a dangerous weapon by a restricted person, one count of discharge of a firearm, and one count of theft by receiving stolen property. Because Archuleta had previously been convicted of a violent felony and incarcerated at least twice before, the State sought to enhance the charges by designating Archuleta as a habitual violent offender. In a bifurcated proceeding the jury also found that Archuleta met the statutory definition of a habitual violent offender. The court then sentenced Archuleta to prison on each conviction.

¶13   Archuleta appeals.

ISSUES AND STANDARDS OF REVIEW

¶14 On appeal, Archuleta raises several issues. First, he contends that, over counsel's objection, the trial court erroneously admitted evidence, including: (1) hearsay of an unavailable witness—Passenger—as a violation of his constitutional right of confronting the witnesses against him, and (2) allegedly incoherent, unreliable, and constitutionally privileged jail phone calls between him and Wife that also constituted hearsay in part. "With regard to the admission of evidence, . . . we review the legal questions to make the determination of admissibility for correctness. We review the questions of fact for clear error" and "we review the trial court's ruling on admissibility for abuse of discretion." *Arnold v. Grigsby*, 2018 UT 14, ¶ 9, 417 P.3d 606 (cleaned up). However, "we will reverse an erroneous evidentiary ruling only if, absent the error, there is a reasonable likelihood that there would have been a more favorable result for the defendant. A reasonable likelihood of a more favorable outcome exists when the appellate court's confidence in the verdict actually reached is undermined." *State v. Kohl*, 2000 UT 35, ¶ 17, 999 P.2d 7 (cleaned up). Insofar as Archuleta contends these evidentiary concerns amount to constitutional errors, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *State v. Maestas*, 2012 UT 46, ¶ 56, 299 P.3d 892 (cleaned up).

¶15 Second, Archuleta contends that the trial court allowed an inappropriate jury instruction regarding his possession of stolen property and failed to provide a "reasonable alternative hypothesis" jury instruction. "We review challenges to jury instructions under a correctness standard." *State v. Powell*, 2007 UT 9, ¶ 11, 154 P.3d 788 (cleaned up).

¶16 Lastly, Archuleta contends the trial court abused its discretion by preventing him from offering testimony concerning his status as a habitual violent offender. As stated, regarding "the admission of evidence, . . . we review the legal questions to make the determination of admissibility for correctness. We review the questions of fact for clear error" and "we review the trial court's ruling on admissibility for abuse of discretion." *Arnold*, 2018 UT 14, ¶ 9 (cleaned up).

## ANALYSIS

¶17 On review, we determine that even assuming Archuleta prevailed on his arguments—and the trial court had excluded Passenger's interview and the jail calls—the remaining, uncontested evidence overwhelmingly points toward Archuleta's guilt. Thus, any alleged errors, including alleged constitutional errors, worked no prejudice against Archuleta, and we determine the alleged errors to be harmless beyond a reasonable doubt. We also conclude that the trial court correctly issued the jury instructions Archuleta now contests. Finally, we conclude the court did not exceed its discretion in excluding testimony that is simply irrelevant. Accordingly, we affirm.

### I. Evidentiary Prejudice

¶18 Where, as here, an appellant contends evidence has been entered in constitutional error, we need not reverse if the State can meet its burden of showing that the "error is harmless beyond a reasonable doubt." *State v. Valdez*, 2021 UT App 13, ¶ 49, 482 P.3d 861 (quoting *State v. Drommond*, 2020 UT 50, ¶ 105, 469 P.3d 1056), *cert. granted*, June 10, 2021 (No. 20210175). In other words, we must determine beyond a reasonable doubt that the error was harmless and that the jury still would have convicted Archuleta beyond a reasonable doubt had the evidence been excluded. This requires us to "determine the

probable impact of the [evidence] on the minds of the average juror." *See id.* ¶ 50 (cleaned up). In so doing, we consider, among other things, the evidence's importance and cumulative nature, and "the overall strength of the prosecution's case." *See id.* (cleaned up). Here, without determining whether constitutional errors actually exist, we reject Archuleta's evidentiary arguments because the State has persuaded us that any evidence entered in alleged error was harmless beyond a reasonable doubt. *See Drommond*, 2020 UT 50, ¶ 98 (declining to determine whether an error actually existed when "any error in [the] case was harmless beyond a reasonable doubt").

A.  Passenger's Statement

¶19  At trial, the State offered evidence of Passenger's statement to provide context for the statements Archuleta made about Passenger during the jail phone calls with Wife. The trial court allowed Passenger's statement because it was "not being offered for the truth of the matter asserted but only to explain [Archuleta's] subsequent statements. As such, the purported statement [was] not inadmissible hearsay."

¶20  Archuleta contends that "the trial court erred in admitting the police report of [Passenger's statement], an unavailable witness, on the basis that it was not hearsay" because the State could not reasonably have offered it for any other purpose except for its truth. On these grounds, Archuleta asserts that allowing Passenger's statement violated his constitutional right to confront witnesses against him.[3] Archuleta then declares the error "was highly prejudicial," but fails to provide any explanation as to why.

---

3. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; . . . .").

¶21 However, Passenger's statement was of limited importance and cumulative of other evidence, and without it, the State's case remained very strong. *See Valdez*, 2021 UT App 13, ¶¶ 49–50. In short, the State has persuaded us that its inclusion was harmless beyond a reasonable doubt.

¶22 Taking the alleged error at its absolute worst, we see no material impact to this case. In relevant part, Passenger's interview included a vague indication that he "was afraid that retaliation for him talking would happen" and his view that police already knew what happened and had the evidence. Passenger also stated that a driver in a different car pulled up to them, threatened to shoot them, and raised his hand before Passenger ducked and heard a loud gunshot. The trial court instructed the jury that the police report containing Passenger's statement could not be used "as proof of any of the crimes in this case" and that it could be used only "to give context to the statements" in the jail phone calls. But even if the jury took Passenger's statement for the truth of the matter asserted, it does not clearly further incriminate Archuleta, and it could even cut against the State's case because it described circumstances exactly opposite of what A.D. described. While the State did use Passenger's statement—in concert with Archuleta's own statements in the jail calls that Passenger was "a rat"—to imply Archuleta's guilt, this inference was hardly the crux of the State's case, and at its worst, carries little weight compared to the remaining overwhelming evidence of Archuleta's guilt.

¶23 Taking the alleged error out of the equation, imagining a scenario where the court excluded the evidence, also does not change our analysis. Indeed, doing so only highlights the State's more important evidence. With or without Passenger's statement, the jury could still consider that A.D. reported a shooting by "a Hispanic man with tattoos—including a star tattoo on his face—wearing a turquoise shirt, a black baseball hat with turquoise on it, and prescription glasses," who had been

driving a "black Charger or Challenger" with a black male in the passenger's seat. And when police located Archuleta, a Hispanic man with a star tattoo under his left eye, he wore a turquoise shirt, black baseball hat with turquoise on it, and prescription glasses. He was driving a black Dodge Challenger with a black male passenger. In that car, police found a handgun one round short of full capacity, which police later determined fired the bullet found in A.D.'s car. And, to boot, Archuleta's cell phone data placed him in the approximate area at the time of the shooting.

¶24 Without Passenger's statements, the jury had not only ample but substantial evidence demonstrating Archuleta's guilt beyond a reasonable doubt. Indeed, the challenged evidence is hardly the State's most important and is cumulative of the other evidence identifying Archuleta as the shooter. *See id.* Even without it, the State's case remained very strong. Accordingly, the State has carried its burden to show that any error was harmless beyond a reasonable doubt.

B.  Jail Phone Calls

¶25 Archuleta also contends that the court erred in admitting jail phone calls contrary to his objections that the calls violated constitutional and evidentiary marital privilege,[4] constituted

---

4. Specifically, Archuleta bases his argument on article I, section 12 of the Utah Constitution, which provides that "a person shall not be compelled to testify against the person's spouse." Utah Const. art. I, § 12. "Utah courts have not determined whether the harmless-beyond-a-reasonable-doubt standard applies to violations of the Utah Constitution," but "[w]e need not resolve that question here, because we conclude that admission of the challenged [evidence] was harmless even under the higher

(continued…)

hearsay in part, and violated Utah Rule of Evidence 403.[5] Archuleta then asserts that the evidence was prejudicial because otherwise, the State would not have used it. Whether the jail calls' admission was actually a constitutional error violating Archuleta's rights under article I, section 12 of the Utah Constitution (or whether the jail phone calls were privileged at all) remains an issue we need not address here, because even assuming that it was, the State has convinced us that the error was harmless beyond a reasonable doubt.[6] *See generally Valdez*, 2021 UT App 13, ¶¶ 49–50.

¶26    Although the jail phone calls may have helped further confirm Archuleta's identity as the shooter, the State did not even rely on the phone calls' most damning contents to make this point in the first place. *See supra* ¶ 10. Instead, during closing argument, the State first focused on nearly all the other evidence identifying Archuleta as the shooter. And while the State may have used the jail phone calls to further incriminate Archuleta, the statements, "I can't blame no one else for my situation but myself" and "[Passenger]'s a rat" merely cumulate, and hardly tip the scales on top of the remaining overwhelming,

_____

(…continued)
beyond-a-reasonable-doubt standard." *See State v. Gallegos*, 2016 UT App 172, ¶ 63, 380 P.3d 44.

5. Again, in admitting these statements, the court instructed the jury that the State did not present Wife's statements in the jail phone calls "for the truth of the matter asserted," but "to provide context to Mr. Archuleta's statements."

6. We note, however, that we recently discussed, but did not rule on, the merits of substantively similar arguments in *State v. Samora*, 2021 UT App 29, ¶¶ 38–40, 484 P.3d 1206, *petition for cert. filed*, May 19, 2021 (No. 20210347).

uncontested evidence. Whether the court admitted the jail phone calls does not change the fact that Archuleta himself; his clothes, tattoos, and glasses; his car; and his passenger all matched A.D.'s description exactly—not to mention that the gun found in his car matched the bullet found in A.D.'s car, and that cell phone data undermined his original statement to police by placing him in the shooting's approximate area during the relevant time frame. Given all of this overwhelming evidence of his identity, any error in admitting the jail phone calls was harmless beyond a reasonable doubt.

## II.    Jury Instruction Challenges

¶27    Archuleta also raises two challenges to the jury instructions, contending first, that the court improperly allowed an unconstitutional jury instruction, and second, that the court erroneously failed to include a reasonable-alternative-hypothesis jury instruction.[7] We disagree.

---

7. Archuleta also contends that his trial counsel offered ineffective assistance and that the court plainly erred in allowing him to be convicted for theft by receiving stolen property even though the evidence failed to support the charge. To support these contentions, he offers some facts about the trial and recites the standard of review for ineffective assistance and plain error claims. But,

> the Utah Rules of Appellate Procedure require an appellant's brief to contain the contentions and reasons of the appellant with respect to the issues presented, with citations to the authorities, statutes, and parts of the record relied on. Briefs must contain reasoned analysis based upon relevant legal authority. An issue is inadequately briefed when the overall analysis of the issue is so

(continued…)

A. Jury Instruction 35

¶28　First, Archuleta argues that the court erred in allowing jury instruction number 35, which dealt with the offense of theft by receiving stolen property. At the time, that offense was set forth in Utah Code section 76-6-408(1), which in relevant part provides,

> A person commits theft if he receives, retains, or disposes of the property of another knowing that it has been stolen, or believing that it probably has been stolen, or who conceals, sells, withholds or aids in concealing, selling, or withholding the property from the owner, knowing the property to be stolen, intending to deprive the owner of it.

Utah Code Ann. § 76-6-408(1) (LexisNexis 2017) (current version at *id.* § 76-6-408(2) (Supp. 2020)). The jury instruction on this charge stated,

> Possession of property recently stolen, if not satisfactorily explained, is ordinarily a circumstance from which *you may* reasonably draw the inference and find, in light of the surrounding circumstances shown by the evidence in the case, that the person in possession of the stolen property knew that it was stolen.

---

(…continued)
　　lacking as to shift the burden of research and argument to the reviewing court.
*State v. Davie*, 2011 UT App 380, ¶ 16, 264 P.3d 770 (cleaned up). We conclude that to be the case here. Reciting a legal standard but failing to apply relevant facts, argue, or analyze, renders an issue inadequately briefed—as such, we decline to address these issues.

Thus, if you find from the evidence and beyond a reasonable doubt (1) that the defendant was in possession of property, (2) that the property was stolen, (3) that such possession was not too remote in point of time from the theft, and (4) that no satisfactory explanation appears from the evidence, then *you may infer* from these facts and find that the defendant knew the property was stolen.

(Emphasis added.)

¶29    In attacking this instruction, Archuleta asserts that the instruction shifted the burden to him to explain his possessing the firearm and thus "directly contradicts [his] right against self-incrimination," in part by impermissibly shifting the burden of proof from the State to him. But his argument overlooks what our caselaw has defined as the most important aspect of such instructions—namely, whether the instruction *required* the jury to make a presumption of guilt, as opposed to *allowing* the jury to make a presumption or inference of guilt. *See State v. Carlson*, 934 P.2d 657, 659–60 (Utah Ct. App. 1997); *State v. Perez*, 924 P.2d 1, 4–5 (Utah Ct. App. 1996).

¶30    Cases reviewing nearly identical jury instructions on this charge have upheld those convictions where the instruction "meant only that if the jury found certain facts that [the jury] may infer from those facts that the defendant committed the theft" and where "the instruction allowed only an inference of guilt, and then only if justified by the facts*." See id.* at 4–5 (cleaned up) (citing *State v. Smith*, 726 P.2d 1232 (Utah 1986)). In other words, courts uphold such jury instructions when "the context of the instruction as a whole allow[s] only a permissible inference." *Id.* at 5. We, therefore, review whether this instruction provides the jury with a mandatory inference or a permissive inference. Where "the instruction in this case does not differ from that in [other caselaw] in any material way, we

conclude that the instruction is constitutional and does not improperly shift the burden of proof to defendant." *See Carlson*, 934 P.2d at 660 (cleaned up). As Archuleta notes in his brief, the difference is semantic, but semantics matter—and the word "may" renders this instruction semantically permissive. Therefore, because the instruction allowed the jury to make a presumption of guilt, instead of requiring the jury to make a presumption of guilt, the court correctly submitted the instruction to the jury.

## B. Reasonable-Alternative Hypothesis Instruction

¶31    Second, Archuleta contends that the court incorrectly failed to provide the jury with a reasonable-alternative-hypothesis jury instruction based on the idea that the jury could have concluded that another person, such as Passenger, was the shooter. Citing this and similar various alternative theories, Archuleta argues that the court should have provided the instruction simply because it is possible that one of these alternative theories could be true. Archuleta concedes that no caselaw required such an instruction in this case but suggests that such an instruction "[n]evertheless . . . is not inappropriate."

¶32    We note that arguing that a trial court was not required to do something but nevertheless could have done it (even though it did not), unequivocally fails to present the kind of error that prevails on appeal. However, our supreme court has dispensed with this question:

> In regard to the propriety of the so-called "reasonable alternative hypothesis" jury instruction, any controversy over its use constitutes nothing more than a tempest in a teapot. The prosecution's burden of proof in any criminal case, whether the evidence be direct or circumstantial, or a combination of both, is that of beyond a reasonable doubt. . . . Thus, if the jury instructions

clearly informed the jury of the standard of proof beyond a reasonable doubt, no "reasonable alternative hypothesis" instruction was required. . . . During the process of determining that the evidence [meets] this high standard, the jurors necessarily exclude[] all "reasonable alternative hypotheses" . . . .

*State v. Burton*, 642 P.2d 716, 719 (Utah 1982) (cleaned up). Accordingly, where, as here, the court properly instructed the jury regarding the standard—proof beyond a reasonable doubt—the court was not required to offer Archuleta's proposed instruction and refusing to do so cannot have been incorrect.

¶33    Therefore, Archuleta fails on both contentions because the trial court properly submitted an instruction including an allowance for a permissive presumption and because the trial court was not required to include a reasonable-alternative-hypothesis instruction.

### III.    Irrelevant Testimony

¶34    Following Archuleta's conviction on the primary charges, the jury faced the issue of whether Archuleta met the statutory definition of a habitual violent offender. Archuleta does not identify any particular testimony he would have provided except to indicate he wanted to opine on whether he deserved to be found a habitual offender. On this issue, the trial court declined to allow him to testify because such testimony would have been irrelevant. Archuleta contends that because he was the defendant he gets to testify in the case. However, this is not how our rules of evidence work, and Archuleta fails to show how the trial court exceeded its discretion in excluding irrelevant testimony.

¶35    Utah Rule of Evidence 402 provides, "Irrelevant evidence is not admissible." And evidence is irrelevant if it does not

"make a fact more or less probable than it would be without the evidence." *Id.* R. 401. All the evidence required to show that a person is a habitual violent offender is that the person convicted of a violent felony must have "on at least two previous occasions . . . been convicted of a violent felony and committed to either prison in Utah or an equivalent correctional institution of another state or of the United States." Utah Code Ann. § 76-3-203.5(b) (LexisNexis 2017). So, after a violent felony conviction on the charge at hand, the only relevant evidence is whether the defendant had enough previous violent felony convictions also resulting in qualifying incarceration. Evidence unrelated to these questions would be entirely irrelevant to the question before the jury because it wouldn't serve to make the elements more or less probable or have any "consequence in determining the action." *See* Utah R. Evid. 401. Archuleta's proposed testimony would not touch on these questions—and indeed, his opinion on whether he deserved to be found a habitual offender represents testimony that would constitute the paradigm of irrelevancy. Consequently, we conclude that the trial court was well within its discretion to refuse to admit irrelevant testimony.

CONCLUSION

¶36    On the record before us, (1) any alleged evidentiary error was harmless beyond a reasonable doubt, (2) the court did not err in the jury instructions it provided or did not provide, and (3) the court did not abuse its discretion in declining to admit irrelevant testimony.

¶37    Affirmed.

——————

ORME, Judge (concurring):

¶38    I concur in the court's opinion. I write separately to register my indignation at the intolerable increase in "road rage" incidents, now quite commonplace in our fair state. *See, e.g.*, Pat

Reavy, *2 People Shot in I-15 Road Rage Incident; Troopers Say Such 'Mind-Blowing' Cases on the Rise*, Deseret News (Jan. 25, 2021)[8] (in reporting on a road rage incident culminating in shots fired and the closing of I-15, article notes that "UHP troopers have reported a sharp increase in the number of road rage incidents in 2020 from the year before"). This is the third road rage case our court has seen recently. *See State v. Watson*, 2021 UT App 37, 485 P.3d 946; *State v. Farnworth*, 2018 UT App 23, 414 P.3d 1053. And obviously, this is just the tip of the iceberg. For every road rage case that results in conviction and appeal, there must be many more that are resolved in plea bargains or convictions that are not appealed and—of even more concern—yet more cases where a road warrior escapes identification and arrest or no report is made.

¶39    How did we end up like this, with so many of us deeming our right to travel in our lane of choice, at our speed of choice, without any interference whatsoever from other members of the traveling public, to be an inalienable right? When I was a boy, I remember my father regularly slowing down and waving a fellow driver over if it appeared that they needed to come into his lane of travel, perhaps so that an upcoming turn could be made or object in the road avoided. That driver would invariably offer a wave of appreciation. My father would wave back. He was not exceptional; this was the norm. Traveling down the highways and byways of Utah was not viewed as a substitute for warfare, but as more of a shared experience in civility. Now, if it appears that a driver wishes to come into our lane, many of us will speed up in an effort to prevent that

---

8.    https://www.deseret.com/utah/2021/1/25/22248578/two-shot-on-i-15-prompting-freeway-closure-near-lehi   [https://perma.cc/673Q-84NL].

maneuver.[9] If the driver comes over anyway, we will be outraged at having been "cut off," as though such a misstep is a threat to civilization as we know it, and the worst among us will reply with honking, flashing lights, swerving, unpleasant hand gestures, etc.

¶40    In a distressing number of cases, particularly outraged drivers will take it a step further and strike the offending driver's car with their own vehicle or, of all things, open fire. *See, e.g.,* Garna Mejia, *Utah Woman, Children Terrorized in Road-Rage Incident on I-15*, KSL.com (Apr. 11, 2021)[10] (reporting that a man rammed a woman's car two times with her young children inside, followed her for ten miles, and yelled "I'm going to kill you! I'm going to kill the kids! Get out, I will show you what's up!"); Mark Shenefelt, *Road Rage on I-15 in Roy: UHP Says Man Tried to Crash Another's Car*, Standard-Examiner (Dec. 21, 2020)[11]

---

9. This is apparently enough of a problem that the Utah Department of Transportation recently saw fit to post this message on its overhead freeway message boards:

IT'S A LANE
NOT A BIRTHRIGHT
LET THEM MERGE

Reem Ikram, *Utah's Highway Message Boards: Who's Behind it All and How to Get Involved*, ABC4.com (Feb. 27, 2021), https://www.abc4.com/news/digital-exclusives/utahs-highway-message-boards-whos-behind-it-all-and-how-to-get-involved/ [https://perma.cc/5CDT-NMMA].

10. ksl.com/article/50144470/utah-woman-children-terrorized-in-road-rage-incident-on-i-15 [https://perma.cc/Q5XN-FKD9].

11.    https://www.standard.net/police-fire/road-rage-on-i-15-in-roy-uhp-says-man-tried-to-crash-anothers-car/article_31144733-207a-5c21-b801-2485a6ff1495.html [https://perma.cc/PVF5-S3RV].

(reporting that an enraged driver swerved between lanes and intentionally struck the victim's vehicle, intending to cause it to crash); Mark Shenefelt, *Man Arrested in Layton After Apparent Ogden Road Rage Shooting*, Standard-Examiner (Aug. 19, 2019)[12] (reporting that as the victim sped up to pass another vehicle to get onto an onramp to I-15, the driver being passed pointed a handgun at the victim, shouted obscenities, and fired a round at the vehicle). As ridiculous as this behavior is, it also sometimes happens that the driver who was flipped off, honked at, or brake-checked will note his disapproval by opening fire. *See, e.g.*, Pat Reavy, *Driver Arrested in Utah County Road Rage Incident Charged with Attempted Murder*, Deseret News (Feb. 2, 2021)[13] (reporting on an incident where a driver noted his disapproval of being followed too closely by hitting his brakes, whereupon the other driver pulled alongside the brake-tapper's vehicle and fired multiple shots into the vehicle). This is enough of a possibility, it seems to me, that those among us who are inclined to flip the bird to note their disapproval of an attempted or accomplished cut-off or other perceived breach of driving etiquette should refrain from such behavior, if not out of basic decency, then out of a legitimate concern that the other driver might be armed and see this as the kind of provocation that warrants gunplay or running a car off the road.

¶41    There might be a tendency to think that those who engage in acts of road rage are limited to a comparative handful of low-lifes, and readers may wonder why I have bothered with

---

12. https://www.standard.net/police-fire/man-arrested-in-layton-after-apparent-ogden-road-rage-shooting/article_0f677c82-2da3-57cd-8cc6-9a992d350fa6.html [https://perma.cc/8VGC-J8B4].

13. https://www.deseret.com/utah/2021/2/2/22262654/driver-arrested-in-utah-county-road-rage-incident-charged-with-attempted-murder [https://perma.cc/Q7BW-H7XB].

this separate opinion since so few members of that subset of humanity are regular readers of appellate opinions. I wish the propensity to behave badly when driving was so limited, but I fear that the attitude that is the genesis of road rage incidents cuts across all segments of our society. Two brief examples may help make the point that "we have met the enemy and it is us."[14]

¶42   A member of my extended family does not come across as a low-life. She is financially well-off, well-groomed, conservatively attired, and a regular at Sunday morning church services. Her personal mantra is "What would Jesus do?" But when driving, she ignores this precept. And she is quite unapologetic about it. She is militantly proud of the fact that if anyone tries to cut her off or fails to move right when she comes up behind them in the fast lane, she will blare her horn with one hand while flipping the offending driver off with the other—a technique she is pleased to have mastered over the years.

¶43   A few years ago, as I was about to make the move from I-15 to I-80, a car flew past me on the right, pulled in front of me, and then slowed down so the driver could honk at, verbally berate, and flip off a driver now on our right, apparently for some perceived affront—very likely the dreaded cutting off. This "fast and furious" driver's tirade went on for a few seconds and his pulling in front of me caused me to brake to avoid hitting

---

14. While this basic phrase is often attributed to the cartoonist Walt Kelly, it has a much more interesting morphology. *See generally* Larry Bush, *The Morphology of a Humorous Phrase: "We Have Met the Enemy and He Is Us,"* Humor in America (May 19, 2014), https://humorinamerica.wordpress.com/2014/05/19/the-morphology-of-a-humorous-phrase/ [https://perma.cc/RF84-NC G7].

him.[15] This allowed me to get a good look at him, and I grimaced when I realized that I knew him. He was a well-known member of the Bar, although in that moment hardly the model of civility to which we, as a profession, ostensibly aspire.

¶44    So while I would surely hope that readers of appellate opinions are not the leading contingent of road rage culprits, there are road ragers among us. For them, and for all their ilk in Utah, my message is simple: Stop it! If you are not inclined to stop it because it is the right thing to do, stop it because you risk being shot or run off the road if you do not.

———————

15. If I were of a different temperament and had a different moral compass, I would have noted my disapproval of his cutting *me* off with horn-honking and bird-flipping, and then where would we have been?